E. Lee Schlender, ISBN 1171
26S0 Holly Lynn Drive
Mountain Home, ID 83647
T:(208) S90-1993
E:leeschlender@gmail.com
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Carol Cole surviving mother individually and as representative of the Estate of Stephanie Lynn (king) Eads (deceased) and  on behalf of all heirs and survivors' including sisters, children, grandchildren. | **CASE NO. 20-CV-155** |
| Plaintiff | **PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL FILED PURSUANT TO  STIPULATION** |
| v. | |
| State of Idaho Department of Corrections and Probation; Minidoka County, Idaho; Cassia County, Idaho owners and operators of the Mini-Cassia Justice Center a joint governmental entity of Minidoka and Cassia Counties; Minidoka County and Cassia County political subdivisions of the State of Idaho operating as per a Joint Powers Agreement as the Joint Minidoka/Cassia County Detention Department dba "Joint Adult Detention Facility" and/or "The Mini-Cassia Criminal Justice Center", Jay Heward Sheriff of Cassia County, George Warrell Director of Mini-Cassia Justice Center, Deborah (Debbie) Bell Chief of Nursing Mini-Cassia Justice Center, Sergeant Frasier Chief Deputy for Mini-Cassia Justice Center, Daniel Renz Deputy for Mini-Cassia Justice Center, Enrica Molina Probation Officer Cassia County, Idaho Jayone Fitzhugh Probation Officer; Amber Prewitt; all individually and in their official capacity and office by election hire or appointment; Basil Anderson M.D. and Taylor McAllister d/b/a A Medical Team Authority; Kent McClellan Chairman Minidoka County Commissioners, Eric Snarr Minidoka County Sheriff. | **(This complaint is not sealed; Docketed in ECF)** |
| Defendants. | |

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
PURSUANT TO STIPULATION – PAGE 1

Comes now the Plaintiff(s) and files her SECOND Amended Complaint pursuant to the Federal Rules of Civil Procedure by stipulation and prior to the filing of any answer or responsive pleading by any and all defendants herein.

## I.     PARTIES CASSIA AND MINIDOKA COUNTIES

1. Cassia and Minidoka Counties are jointly and severally liable for the death of Stephanie Lynn (King) Eads born October 24, 1975 in Rupert, Idaho and all damages arise therefrom. Their liability is based upon failure to preform non-delegable duties in the operation of the Cassia/Minidoka Detention Center, aka Adult Detention Facility, aka Minidoka/Cassia County Detention Department Their duties and obligations are stated in the Constitution of the State of Idaho and their Joint Operating Agreement dated June 15, 2015 (the Agreement) for the Adult Detention Facility in Burley Idaho which provides:

A.     Costs of Operation and Maintenance; the parties (counties) shall share the costs of operation and management to include... medical services.

Article Il (3) on Page 4.

Continuing duties of the counties and no other entity are:

B.     The parties hereto shall be jointly liable and responsible for all damages to person or property that occur as a result of or in the course of the operation of the Joint Facilities, including judgments rendered in a court of competent jurisdiction for claims against any employee or official of the facilities, the department or an facility or property of or under the control or management of the department Cassia County shall have the responsibility to adjust and defend claims arising out of the operation of the Adult Detention Facility.

Article V (1) Liability, on Page 11.

C.     The Joint Adult Detention Facility... shall be insured by the insurance coverages of the respective counties. The cost of insurance premiums paid... "shall be included as a cost of operation of the department and shall be paid equally by the counties".

Article V (2) Insurance, on Page 10.

2. A Joint Powers Agreement (JPA) dated June I, 2015 is attached to this amended complaint as Exhibit A. It was formed for the two counties to jointly share operation and ownership of all adult and juvenile detention facilities. The adult jail is in Burley where Stephanie died; the juvenile facility is in Rupert. The Cassia County Sheriff's Department staffs the adult facility; Minidoka

County Sheriff's Department staffs the juvenile facility.   The Cassia County Sheriff's Office is the "immediate" director of the Cassia facility; he is to manage the adult facility and report to an Executive Board; Minidoka Sheriff's office has the same duties operating the juvenile facility in Rupert.

3.      The intent of I.C. §67-2328 is clear; to allow two or more governmental bodies to contract between themselves to jointly operate, own and administer a government function, such as roads, sewers, police departments, etc.  It states: "... The state or any public agency thereof when acting jointly with another public agency of this state may exercise and enjoy the power, privilege and authority conferred by this act; but nothing in this act shall be construed to extend the jurisdiction, power, privilege or authority of the state or public agency thereof, beyond the power, privilege or authority".

4.      The Joint Powers Agreement (JPA) retains all for both counties their vested powers, providing for the Sheriff or other officers elected or appointed under their authority to assist the counties in operating the detention centers exactly as done by Cassia and Minidoka.   All final policy-making authority and control of the Joint Facilities rests with the county commissioners of Cassia and Minidoka; the new jail facilities are managed by an executive board and a county sheriff together acting as a "department" which is "accountable to the board of county commissioners of each county and the elected county sheriffs of each county." (Agreement Page 1 Paragraph b.)

5.      No New Entity.  §I.C. 67-2328 provides that the counties can form a new legal entity to own and operate their joint facilities or, they can continue operating the same as in the past but by using an executive board comprised to officials of both counties; they report to the county commissioners. The Joint Agreement did not create a new or separate entity such as a partnership or perhaps a governmental corporation. (The reader can be forgiven for assuming a new entity may exist and that descriptions of its activities, personnel and operation are tied to a new and separate legal entity of government.  Names and terms are sprinkled throughout  the Agreement without a clear explanation that they refer to future and ongoing internal functions of the two existing adult and juvenile jails and not to operations as existed prior to the  Joint Agreement. For example, various operations and buildings are given new names including Mini-Cassia Justice Center (the adult jail in Burley were  Stephanie died); "Departments"; Director(s); Detention Department and Joint Detention Adult Facility;  different names for the same function or jail.

6.      The Joint Operating Agreement, on page 1 paragraph 1, states that it is meant to "define and clarify the rights, responsibilities and obligations of the parties and their employees and to conform  the agreement to actual practices... since 1990." The "Department" under the new Joint Agreement  includes a Director, a Minidoka /Cassia County Detention Department,  an  Executive

Board, and joint adult and juvenile detention facilities.   At Page 2, paragraph 1, the agreement states that: "That the parties have established and by this agreement do hereby continue the Joint Minidoka /Cassia County Detention Department. This department shall continue to manage the jointly owned detention facility for the detention of adult defenders located in the City of Burley, Cassia County."

7.      As of the date and time of this Amended Complaint no document or writing has been discovered that established a Joint Minidoka/Cassia County Detention Department, as a functioning division of either county prior to the Joint Powers Agreement (JPA) . However there exists no fact or legal reason not to accept the plain language of the Agreement; that a Department to operate the detention facility existed since the 1990's regardless of what it was called by the counties. The existence of an existing Department as recognized in the Joint Agreement confirms that Cassia County exercised historical jurisdiction and control over the jail system in Burley, Idaho, by use of a "department" with duties and obligations that remain vested in the county except as granted to the Joint Powers Agreement (JPA) which allows each county to retain ownership and shared control.  What cannot be done is for the county to agree to turn over all statutory duties to a subservient executive board and the reorganized Department, thereby divesting the county of its legislatively imposed obligations. *Roberts v. Trans Dept,* 21 Idaho 727, 827 P.2d 1178. Additionally and in the same vein is I.C. §67-2328 stating that " No agreement made pursuant to this act shall relieve any public agency of any obligation or responsibility imposed upon it by law except that to the extent of actual and timely performance thereof by a joint board or other legal or administrative entity created by an agreement made hereunder, said performance may be offered in satisfaction of the obligation or responsibility." Accordingly, the executive board established by the two counties can be designated to perform certain duties of the counties so long as it operates under the direction and control of the counties exercising their oversight obligations stated in the Joint Powers Agreement (JPA).

8.      To summarize; the Joint Powers Agreement assumes there existed a "Department" which operated the old jail and will operate the new one. This "Department" was and is ultimately accountable to the county commissioners of both counties. Page 1 paragraph C. This is an umbrella statement; recognizing and incorporating into this "new" Department the same staff and organization of the existing Sheriff, with a new Executive Board, a director of the facility and all employees. The Sheriff's Department of Cassia County is to manage the day-to- day operation of the adult jail. The Joint Powers Agreement (JPA) is between Cassia and Minidoka counties; they are the enabling and ultimate authority of and for the continued Department.  The state enabling statute specifically states that the power and authority of the state or a public agency cannot be

construed as being beyond that which that agency (county) might have if "acting alone". Since the counties did not form a new legal entity, the default method of operation was mandated to be an operating agreement as per subparagraph (b) (d) of I.C. §67- 2328. This operating agreement states that it is a "department" called the Minidoka/Cassia County Detention Department which now has a board (The Executive Board) comprised of the prosecutors, commissioners and sheriffs of both counties, who govern the "Department." (To this date no statute, law or ordinance has been discovered that established the "Joint Minidoka/Cassia County Detention Department" prior to or after the Joint Agreement date of June 2015.)

9.     Cassia County operates the adult facility in Burley as provided for in I.C. §67- 2328 by an executive board, which has defined powers, which include:

  a. Hire and supervise the Director of the Adult facility. In this case, Mr. Worrell.
  b. Establish policy and procedures for operation of the joint/detention Department.
  c. Oversee all management of the Joint Adult Detention Facility.
  d. Budget and manage the finances of the facility.
  **e. Provide for medical services.**
  f. Enter into contracts between the Department and others.
  g. Provide for education and rehabilitation of prisoners.
  h. Coordinate administration of the Detention Department with the Sheriff9s Departments of the counties.
  i. Approve and establish the prisoner populations.
  j. Issue quarterly reports to the county commissioners.

  (See, page 2 and 3 of the Agreement).

10.     These duties are largely duplicated as also being the responsibility of the county sheriff; the operation of the Adult Facility is described as a function of "management" and again, the "management" is first performed by the elected sheriff who reports and is subject to the authority of the executive board.

11.     The Executive Board issues a quarterly written report to the Boards of County Commissioners of Cassia and Minidoka Counties detailing operations, populations, budgets, items of legal or fiscal impact or other items "necessary for the knowledge of the Board of Commissioners."

12.     The duties of the executive board acting first through the sheriff of Cassia County including "Legally required medical care" are expressly stated to be the responsibility of the same executive board. Article II, section 4(g), page 5, addresses medical care in the context of "management"; it is the responsibility of the executive board to make policy and monitor delivery of medical care by the staff or a separate provider. The terms and conditions of any

doctor furnishing medical care to inmates is exclusively handled through the Joint Operating Agreement chain of command; first by the executive board and the sheriff and at the top, the county commissioners representing Cassia and Minidoka Counties. The counties contracted for outside medical providers to service the inmates ; the county commissioners are the governmental officials who signed the contract (Exhibit B).

13.      The Executive board of the Department hires and fires the Director of the Joint Adult Detention Facility. (The website of Cassia County states there is a sub-director on site; Mr. George Worrell, a Cassia County employee presumably from the office of the Sheriff, although no written document establishes the office or duties of the on site Director. Since the sheriff is elected, the hired "director" is presumed to be a separate officer, Mr. Worrell.) All operations of the detention center (jail) must have final approval by the Board of Commissioners; the employees of the Adult Detention Facility are all Cassia County Employees. All employee disputes are appealable to the county commissioners and all hiring's are first approved by the executive board with a final decision being made by the commissioners. (Joint Agreement, Pages 9 and 10). The Cassia County Clerk/Auditor Office performs all fiscal duties including payment of bills and expenses. Although the Joint Agreement states the Sheriff of Cassia County is the director of the jail, in fact and practice there is a separate office of Director (Mr. Worrell) who directs operation of the adult facility now named The Mini-Cassia Justice Center. The "Mini-Cassia Criminal Justice Center" (same physical buildings) is owned, operated and maintained by the counties. That is the name of the entire jail facility. It is not a new legal entity but simply a name. It is referenced on the same page of the Agreement (page 4) as being the "Joint Adult Detention Facility." The Agreement has a unique clause; it provides for payment of all judgments against for all individual detention facility employees or officials of the center which presumably includes the sheriff, the executive board, the on site detention director and all others who operate and manage the detention facility. (Agreement, page 11; Liability.)

14.      The county commissioners alone have the authority to amend the Joint Operating Agreement. (Agreement, Page 12; Amendments and Modifications.) Although the executive board in the first instance is designated as the administrator of the Agreement, its actions are subject to the final approval "of the boards of county commissioners of the respective counties." (Agreement Page 13; Administration of the Agreement)

II.      ADDITIONAL PARTIES

15.      Plaintiff Carol Cole is the natural mother of Stephanie Lynn Eads deceased; She is

an heir and representative of her estate under Idaho law and brings this action with the advice and consent of all other heirs, children and relatives of Stephanie entitled to bring an action as per the laws of the United States and Idaho, including the following: sisters of Stephanie include Amber Smith, Lacy Mateo and Staci Arthur. Children include Kassidie Eads, Kylie (Austin) Kimber and Logan Eads. Carol will file an estate and trusteeship under the laws of the State of Idaho for the benefit of the heirs, survivors and beneficiaries of Stephanie Lynn (king) Eads deceased.

16.    Defendant Jay Heward is and was at all relevant times, the Sheriff of Cassia County. At all relevant times, Heward as sheriff was responsible for the staffing of the Mini-Cassia Justice Center (hereinafter the "Jail"), and all actions taken or not taken by Jay Heward were in such capacity and also in his individual capacity. Eric Snarr was the sheriff of Minidoka County. The statutory duty to hold a person accused of a crime falls on the Sheriff in whose county the offense is alleged to have occurred. The criminal case that sent Stephanie on the rider was a Minidoka case and the probation violation was from that case. Because of the Joint Powers Agreement (JPA), the Minidoka Sheriff turned care and custody of Stephanie over to the Cassia Sheriff and jail staff – although not required to do so by his statutory obligation but by the Joint Powers Agreement (JPA). If the JPA is not found to be controlling as to detention, the Minidoka County Sheriff had and has the ultimate statutory obligation to incarcerate Stephanie deceased and afford her all the rights and privileges of the Constitutions of Idaho and the United States of America. Additionally, the sheriffs of both counties are responsible for the implementation of the JPA as per its terms which includes proper care of inmates.

17.    Deputy Frasier, George Warrell, and others whose names are not now known, (hereinafter "Jailers") are, or were at all relevant times, employees or Jailers in the Mini Cassia Justice Center. Upon information and belief, each of these defendants is a resident of the State of Idaho. George Warrell is designated as the supervisor and director of the Center; it is believed that he operates and reports in an established chain of command, to Sheriff Heward.

18.    Deborah (Debbie) Bell and others now unknown and designated until identified followed by amendment of this complaint as A-Z; are health care professionals who are or were at all relevant times, direct employees or providing services as per a contract with Mini-Cassia Justice Center and upon information and belief each of these defendants are residents of the State of Idaho.

19.    Basil Anderson M.D. and Taylor McAllister, Physician's Assistant d/b/a

Medical Health Authority are health providers who provided medical and health services to Stephanie and all other inmates and entered into an "INDEPENDENT MEDICAL SERVICES CONTRACT" (Exhibit B hereto). These individuals and health providers not only did not afford Stephanie their medical obligations and duties as per the medical services contract in every respect but also acted with deliberate indifference; Defendants were deliberately indifferent; acted wantonly and willful; particularly in having historical background knowledge of Stephanie including her recent industrial accident resulting in the nearly complete amputation of her left hand; that dependency on pain drugs was a significant threat to her health; she was to be under their continual observation and control for more than fourteen days while imprisoned; knew that she was desperately ill facing impending death unless treated with the appropriate medications, hospitalization and medical attendance; they acted in concert and deliberately refused and failed to provide any of such needed medical care all in violation of the Eighth Amendment of the Constitution of the United States of America. However, by the terms of the Joint Powers Agreement (JPA) managed by the executive board and the sheriff for the benefit of the two counties, Cassia County by the JPA cannot divest itself of a non-delegable duty as a matter of law, which as per the terms of the Joint Powers Agreement (JPA) is a duty of a management board, which only acts as per authority granted by the respective counties. The Agreement plainly states that the counties accept joint and several liability for any damages or injuries arising from the ownership and operation of the Min-Cassia Criminal Justice Center.

20.     Daniel Renz is an officer with supervisory powers over the jail. Enrica Molina and Amber Prewitt were officers and/or probation officers and employees of the counties named and the Mini-Cassia Justice Center, who had direct responsibility for Stephanie; each are believed to be residents of the State of Idaho.

21.     At all times relevant to this Complaint, each of the individual defendants was acting within the course and scope of his or her employment or separate contract with Cassia and Minidoka Counties by operating the Mini-Cassia Justice Center and jail facility; regardless of whether any defendant was employed per a contract other than with the counties, their duties were non-delegable.

22.     Jayone Fitzhugh was and is a probation officer of the State of Idaho. The probation officers reported and/or were responsible to the State; the Sheriff, the Center Director, all health providers and ultimately as per the chain of command to the commissioners. Mandated was

reporting the medical care and treatment of Stephanie, coincidental with reporting by all officers and jailers.

### III.    SUMMARY OF SIGNIFICANT EVENTS

23.     Plaintiff Carol Cole et al., by and through the undersigned attorney E. Lee Schlender brings this action against these defendants in their official capacities and individually for the pain and suffering; loss of life; loss of companionship and love; care and devotion and wrongful death of Stephanie Lynn (king) Eads (hereinafter in some sentences referenced simply as "Stephanie" who died at the Mini-Cassia Justice Center detention facility in Burley, Idaho on January 24, 2020 while incarcerated for a parole violation and possession. From her first day in jail until her death an infected stump of her left hand needed medical treatment, which was obvious to any layperson. The intentional and purposeful withholding of medical care deprived her of the protection of the laws of the United States of America and caused her untimely and totally preventable death at the age of 44.

24.     The defendant counties operate what is designated as the Joint Adult Detention Facility which is comprised of a jail in Burley Idaho owned jointly by the counties, which is also named and known as The Minidoka-Cassia Criminal Justice Center (Article n,paragraph 1 page 4 of the Amended and Restated Joint Powers Agreement (JPA) Exhibit A ) but also referenced as the Joint Minidoka/Cassia County Detention Department (Article I, paragraph 1 page 2 of the Amended and Restated Joint Powers Agreement (JPA), Exhibit A ) providing proof that the counties own and operate a county jail Department. Staffing of the Center (jail) is provided by officers, jailers and other employees as well as elected officials of both counties all operating under color of law for their respective governmental subdivisions.

25.     Defendants were deliberately indifferent; acted wantonly and willful; having historical background knowledge of Stephanie including her recent industrial accident resulting in the nearly complete amputation of her left hand; that dependency on pain drugs was a significant threat to her health; she was under their continual observation and control for more than fourteen days while imprisoned; knew that she was desperately ill facing impending death unless treated with the appropriate medications, hospitalization  and medical attendance; they acted in concert and deliberately refused and failed to provide any of such needed medical care all in violation of the Eighth Amendment of the Constitution of the United States of America. Their inaction; watching her slowly die; was nothing less than barbaric, perhaps fitting in the Middle Ages but not in the United States in 2020.

26.      Stephanie was detained in a holding cell and despite the urgings of other inmates, staff, and other persons at the detention center and despite the personal and telephone requests and urgings of Carol Cole her natural mother and despite the clear warnings of impending doom as contained in the records in the Jail's own possession and in possession of the judicial system of the Fifth Judicial District, the employees, staff, officers, director and Sheriff provided no medical attention or treatment to her infection and the deterioration of the amputation stump; they simply ignored Stephanie's unremitting suffering over a period of not less than fourteen (14) days, directly causing her death on January 24, 2020.

27.      Stephanie was known to be suffering from an industrial accident and amputation of her left hand and known to be in severe pain and disability and not properly eating, drinking, or sleeping. She was day after day growing weak and unresponsive from the time of her first arrest and detention until she died on January 24, 2020, in the Justice Center facility. Stephanie died from what is commonly referred to as acute endocardia bacterial infection of her heart, including the bicuspid valve which ultimately was severely damaged leading to the collapse of her heart and a lack of blood flow to her brain with death following and a secondary staphylococcus aurous infection.

She was over the period of not less than fourteen days increasingly withdrawn, unresponsive and crying for help and assistance with no response by the staff of the Detention Facility as necessary to provide her appropriate medical treatment. With the administration of appropriate antibiotics and hospitalization Stephanie had a high probability and certainty of recovering from this bacterial infection and but for the lack of prompt and necessary medical care, would have survived the episode of endocarditis and a secondary staphylococcus aurous infection.

28.      At fault for Stephanie's death are all of the individuals named herein individually and in their official capacity; it is believed there are other personnel identified in records of the Detention Center and/or the Court system of the Fifth Judicial District in and for the State of Idaho as well as county and city police and sheriff department records who may be found to be also responsible for Stephanie's death; when and after those records are reviewed this complaint may be amended to add additional defendants.

29.      Stephanie Lynn Eads, born October 24, 1975 in Rupert, Idaho was living in the Mini-Cassia area in January of 2020 and under the control and supervision of the State of Idaho probation departments by reason of conviction of a drug use/possession felony. She was under continuing adult supervision. The sheriff and the police officers, probation staff and their

departments were fully aware of Stephanie's status; her conviction and release upon a rider program and her being followed pursuant to a probation agreement until she had completed her full sentence as imposed. They were also aware from their contact with Stephanie after the time of her industrial accident that she had suffered a near complete amputation of her left hand; that she was severely crippled and recovering from her stump wound surgery.

30.      Stephanie needed to be continually medically followed; her past drug use and potential for relapse was increased by the opiates and other drugs mandated by reason of the amputation of her hand that was ripped away from her arm. The probation department and staff therefore knew she was at high risk for relapse. Her allowed use of pain medication while on probation was approved by the felony probation system of the state of Idaho, responsible for her successful re-entry into society in Minidoka and Cassia counties. The probation officers knew that she was severely disabled yet she courageously tried to hold down any job she could.

31.      E. Lee Schlender is the attorney for Carol Coles, Stephanie's estate and all those named herein as survivors, heirs and any person(s) entitled to damages by reason of her death. At this time Mr. Schlender has none of the records of the Detention Center and therefore documentation of what went on at the jail is virtually unknown except that she was not given medical help or attention. It is known that she was placed in a solitary cell at least part of the time with no bed or running water. She was not eating or drinking and that she was even unable to walk to her jail door and food portal to get meals that were sometimes delivered to that cell door.

32.      It is believed that there is videotaped evidence of her condition, treatment and any responses of jail staff since there was video surveillance of the entire jail and corridors.

33.      For some unknown reason Stephanie was held in solitary isolation, which contributed to her inability to get the attention of the proper prison officials and staff so that she could receive medical care. On or about January 17, a friend of Stephanie and her family sent an email to the detention center staff, attached hereto as Exhibit C, urging that Stephanie immediately be given proper medical care and attention; that she was so dehydrated that her lips had split and she could not stand and that she was in critical condition and close to death. The email states, "She is in isolation and apparently not doing well at all. I am sure you see this a lot but her family is very concerned she is going to die in there". The email went unanswered; the emailed letter was delivered seven days before she died. The email author called the jail nurse defendant Debbie Bell who he personally knew and left messages for her; there was never an answer or acknowledgement Multiple phone calls to the jail made by family and friends were totally ignored or answered with flippant information; staff was on vacation; forms had to be completed; no one at

the jail had the time to read the requests for visitation or return phone calls.

34.       No one made a request to have her transported to and treated in a hospital facility, which was available a few minutes from the jail. Instead she was locked in a filthy solitary cement cell at the Detention Center. Due to a lack of sanitary conditions she could not care for herself. Stephanie was chained, belted and trucked to the Minidoka County District Court on January 21 and the next day the 22nd for an appearance and arraignment on the charge of violation of the terms and conditions of her probation to wit; that she not be in the vicinity of users of narcotics and other drugs and possession. Her being at a residence raided by the police lead to her being taken to the detention center in the first place.

35.       Considering her recently amputated hand; the fact that once before while on probation and known to one or more of the arresting officers she had been taken back to Salt Lake for treatment of a stump infection, she should have been released; she was never a violent offender or threat to others. At the time of her presentation in Court she was so debilitated that the Judge refused to continue the proceedings.

36.       The judge then terminated her court appearance and she was returned to the Detention Center and put into a solitary cell which continued until January 24, 2020 when she was discovered as being unresponsive and dead. She did not die at the hospital as claimed by some defendants; in the ER department of the hospital it was observed that her eyes were totally glazed and clouded. At all times she was under the custody of the Sheriff of Minidoka County, the probation department and all staff.

37.       An autopsy was performed in Ada County, State of Idaho. The Prosecuting Attorney and Coroner's Office have refused to give to Carol Cole or Mr. E. Lee Schlender, the autopsy report or any of the other reports of investigators, including that of the Idaho State Police who performed or are still performing, a criminal investigation into her death.

38.       It is believed the autopsy revealed that Stephanie died from an untreated infection of her amputation stump and arm, which was ravaging her entire body and heart. This condition if diagnosed at an appropriate time, known as infective endocarditis and the staph infection was treatable with medications and if necessary, surgery. Multiple times telephone contact was refused and messages unanswered; visitation was refused for her mother and for Stephanie's daughter and her sister with the excuse that forms needed to be completed and no one was there "to read them" or approve of the visitation.

39.       Stephanie died from a completely preventable ultimate deterioration and destruction of valves in her heart destroyed by the raging infection in her blood stream.

40.      The Sheriff's office and all of the staff at the Detention Center, including deputies and jailers ignored Stephanie's known, obvious and severe deteriorating mental and physical condition for nearly two (2) weeks and simply watched her slowly die. Their actions were by any definition grossly negligent, reckless, willful and wanton and can be aptly described as barbaric. Other inmates as well as jailers could hear her screaming and crying in pain; pleading for help. None was given.

41.      All individuals responsible for the care of Stephanie knew that almost to the day, in a year prior to 2020, another inmate who was very sick and required medical attention which was not given, in a demented state spent 5 to 6 hours vomiting and screaming and died in the same facility.

42.      They therefore were or should have been highly vigilant and on alert to assure that another inmate did not suffer the same fate; not providing surveillance and medical care had led to this very recent death of a young man.

43.      Attached hereto and incorporated as part of this Complaint are the following:

> Exhibit C is a copy of the Smith email to the jail nurse Debbie Bell.
>
> Exhibit D is a photograph of the amputation stump of Stephanie's left hand.
>
> Exhibit E. is a photo of Stephanie in a hospital bed with the amputation arm visible.
>
> Exhibit F. is a copy of an X-ray taken in Salt Lake City of her hand and fingers traumatically ripped away from her left arm.

## IV.   JURISDICTION AND VENUE

44.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides district courts' jurisdiction over all civil actions arising under the Constitution and laws of the United States. This Court also has jurisdiction pursuant to 28 U.S.C. §1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

45.      Accordingly, this Court has locale and United States District jurisdiction pursuant to 28 U.S.C.§1331 and 1343(a)(3). The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C.§ 1367. Venue is proper in this district pursuant to 28 U.S.C.

§1391(b); the Defendants reside and are citizens of this judicial district and the events giving rise to Plaintiff's claims occurred in this judicial district; within the state of Idaho in counties Minidoka and Cassia.

46.     In summary; this is an action to redress the deprivation of Stephanie's and her heirs of constitutional rights under the Eighth and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

## V.     GENERAL CONSTITUTIONAL AND CASE LAW PRINCIPALS APPLICABLE TO THIS CASE

47.     Plaintiffs' attorneys recognize that the statutes and regulations that are the foundation of litigation commenced by prisoners based upon the Eighth and Fourteenth Amendments to the United States Constitution are often referenced improperly, understandable since Constitutional issues are not the bread and butter of most lawyers. A point often missed is that violations of basic American law are centered on rights afforded by specific constitutional amendments founded upon English legal traditions and not on principles of tort or negligence standards. Reliance on common theories of negligence law is misplaced. Pleading that some staff are at will employees or as elected and/or appointed officials that were negligent, careless or uncaring often mischaracterized as the gravamen of the actions. In fact and law, most subjective averments claiming inadequate medical care for Stephanie and similarly situated persons constrained in prisons and jails are a hybrid of medical malpractice law based on standards of care which are not normally thought have as constitutional questions but practiced normality in a medical field.

48.     Accordingly, the plaintiff herein is asserting facts and actions that are not merely negligent conduct, but considered by federal courts to state alleged viable actions against governmental entities and individuals carrying out official duties when hired, contracted for or elected. (herein Stephanie Eads deceased was the prisoner) :

    a.     The cornerstone of an action for the lack of proper medical treatment in prisons is the Deliberate Indifference Standard; ignoring the serious medical needs of Stephanie was egregious enough to be a violation of the Eight and Fourteenth Amendments to the United States Constitution.

    b.     Claims based upon § 1983, are violations of rights protected by the Constitution and also created by federal statute which violations were proximately

caused by conduct of a person or persons acting under color of state law. *Crompton v. Gates. 941* F.2d 1418, 1420 *(9th* Cir. 1991}.

      c.     Claims of Stephanie based upon the Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 {1976). In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed

      d.     Stephanie had a pretrial right to adequate medical care, under the due process clause of the Fourteenth Amendment. *Gordon v. City. of Orange. 888* F.3d 1118, 1120 *(9th* Cir. 2018). The elements of such a claim are: (1) "the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined"; (2) "those conditions put the plaintiff at substantial risk of suffering serious harm"; (3) "the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved- making the consequences of the defendant's conduct obvious"; and (4) "by not taking such measures, the defendant caused the plaintiffs injuries." *Id* at 1125. With respect to the second element, a medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of **pain.**'" *McGuckin v. Smith.* 974 F.2d 1050, 1059 (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976}). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin. 914* F.2d at 1059-1060.

      e.     A municipality or private entity performing a state fun on "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it *"Clouthier v. County of Contra Costa. 591* F.3d 1232, 1250 *(9th* Cir. 2010), *overruled in part on other grounds by Castro v. City. of Los Angeles,* 833 F.3d 1060, 1069 *(9th* Cir. 2016) (en bane}.

f.      To state a claim under 42 U.S.C. § 1983, Carol Cole must show how a defendant caused the harm alleged in the complaint. *Leer v. Murphy,* 8 F.2d 628, 633 *(9th* Cir. 1988). The claim may not be brought on the sole theory that a supervisor is liable for the acts of his or her subordinates. *See Polk County v. Dodson,* 454 U.S. 312, 325 0981}: *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691 (1978). Rather, a plaintiff must show the individual defendant participated in or directed the alleged harm or knew of the harm and failed to act to prevent it. *See Barren v. Harrington,* 152 F.3d 1193, 1194 {9th Cir. 1998), cert. denied, 525 U.S. 1154 (1999).

g.      The State of Idaho and its political subdivisions including Minidoka and Cassia Counties had an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103-05 (1976). Failure to fulfill that obligation can constitute an Eighth Amendment violation cognizable under § 1983. */d At* 103-05. To prevail on the Eighth Amendment claims for inadequate medical care, Plaintiffs must show that Defendants were deliberately indifferent to her "serious medical needs." *Id* at 104. This includes "both an objective   standard- that   the deprivation was serious enough to constitute cruel and ·unusual punishment- and a subjective standard-deliberate indifference." *Snow v. McDaniel,* 681 F.3d 978, 985 *(9th* Cir. 2012).

h.      To satisfy the objective standard Carol Cole must demonstrate there was the existence of a serious medical need. *Estelle.* 429 U.S. at 104. "Such a need exists if failure to treat the injury or condition• could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain.'" *Colwell v. Bannister.* 163 F.3d 1060, 1066 *(9th* Cir. 2014} (quoting *Jett v. Penner.* 439 F.3d 1091, 1096 *(9th* Cir. 2006)}.

i.      "A prison official is deliberately indifferent under the subjective element of the test only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" *Colwell.* 763 F.3d at 1066 (quoting Toguchi, 391 F.3d at 1057)). This "requires more than ordinary lack of due care." *Farmer v. Brennan.* 511 U.S. 825, 83S (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id* at 837. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States.* 838 f-'.2d 390, 394 *(9th* Cir. 1988).

j.      All applicable provisions of the case law above stated, and the Civil

Rights Acts of the State of Idaho and the United States of America, including those as stated in §1983 of the 1871 Civil Rights Act and the 14th Amendment of the United States Constitution for deprivation of property and life without due process of law are relied upon by Plaintiff herein.

k.    Each and every law, codes or statutes of the State of Idaho and/or the United States of America as cited and set forth in this complaint, including those referenced in every title, cause of action or count of this complaint which sound as violations of the United States Constitution and the Amendments thereto are applicable herein as the cause of Stephanie's death.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

*42 USC   §1983- all individual defendants in violation of the 14th Amendment
(Unconstitutional Failure to Provide Medical Care)*

49.    Plaintiff incorporates by reference all foregoing paragraphs of this Complaint as though fully set forth herein.

50.    The 14th Amendment to the United States Constitution granted Stephanie Eads the established right not to have officials exhibits deliberate indifference to serious medical needs, including those caused by her recently amputated hand and remaining arm.

51.    At all times hereto, and in performance of the acts set forth herein, Defendants acted under color of state law. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violations of constitutional rights alleged herein.

52.    The conduct of the defendants alleged herein, including (a) denying Stephanie Eads medical treatment, and (b) failing to intervene when they knew that Stephanie Eads could not eat or drink for herself violated her rights under the Fourteenth Amendment Their actions were a conscious decision pursuant to their practices and customs as herein described.

53.    As described above, each of the individual defendants made intentional decisions with respect to the conditions under which Stephanie Eads was confined, which conditions put Stephanie Eads at substantial risk of suffering serious harm. The defendants did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have recognized the high degree of risk involved; the defendants caused Stephanie Eads's death. Among· other actions as described herein as foundational facts,

defendants:

     a.      Were aware from the inception of her incarceration that Stephanie Eads was seriously physically ill and unable to recognize or care for her own needs;

     b.      Were aware that Stephanie Eads needed medical treatment, including prescription and provision of medications and treatment for dehydration, and that they could get Stephanie Eads such treatment at a local hospital if they were simply willing to transport her there; the hospital was not more than fifteen minutes traveling time from the jail.

     c.      Were aware that Stephanie Eads had not anything to eat or drink for several days; were aware that at various times Stephanie Eads's cell had no working sink, toilet or other source of water.

     d.      Did not refer Stephanie Eads for medical diagnosis or treatment, or for medical care treatment, despite her obvious and known needs;

     e.      Were deliberately indifferent to Stephanie Eads's medical needs.

     f.      That they caused Stephanie's conscious pain and suffering and her loss to her next of kin of her protection, care, assistance, society, companionship, guidance and love.

54.     In addition to the foregoing, defendant Warrell and other individually named defendants were affirmatively told by Stephanie Eads's family, whom these defendants individually named knew to be local and good outstanding citizens of the two counties, of the urgent need for Stephanie Eads to have antibiotics and other treatment or she would die.

55.     In addition to the foregoing, and in spite of having a nurse and/or a physician's assistant employed to care for the medical needs of inmates at the jail, there was no intervention by any medical provider or person.

56.     In addition to the foregoing, George Warrell designated as the supervisor and director of the Center and other individually named defendants intentionally refused to arrange transportation of Stephanie Eads to the local hospital for medical treatment.

57.     As a result of the individual defendants' actions described above, Stephanie Eads suffered a long and solitary death during a prolonged physical deterioration of her entire body.

58.     Defendants' actions and/or inactions violated clearly established constitutional rights known to any layman which Minidoka and Cassia County employees knew mirrored the foundational law of our civilized society.

59.     Stephanie Eads's estate is entitled to compensatory damages in amount to be determined by the jury.

60.     As the result of Defendants' unlawful actions, Plaintiffs have had to retain experienced attorneys.

61.     Defendants' actions manifested reckless and callous indifference to the rights and safety of Stephanie Eads, and punitive damages are appropriate to deter such conduct in the future, to be awarded against each of the individual defendants.

## SECOND CLAIM FOR RELIEF

### 42 USC§ 1983
### Violation of the 1lh Amendment (Minidoka and Cassia county)

62.     Plaintiffs incorporate by reference all other **paragraphs** of this Complaint as if fully set forth herein.

63.     As described above, Stephanie Eads's death resulted from systemic failures within the Jail, including the collective actions or failure to act of most or all of the Jail staff.

64.     The actions of Minidoka and Cassia county jail employees were pursuant to the County's policy, practice, or custom that included, but was not limited to:

     a.     A policy, custom or practice of not providing medical care screening to obviously physically ill inmates at or near the time of booking;

     b.     A policy, custom or practice of providing insufficient medical care to inmates of the Minidoka and Cassia County Jail facility known as the Mini-Cassia Justice Center;

     c.     A policy, custom or practice of not using the on-call medical staff for consultation or treatment even when the officers recognize signs of severe illness;

     d      A policy, custom or practice of not responding to severe illness by withholding basic necessities, including emergency medical care;

     e.     A policy, custom or practice of hiring medical care staff indifferent to the medical needs of detainees;

     f.     A policy, custom or practice of not responding to corrections officer reports and questions about inmates' severe illness;

     g.     A policy, custom or practice of denying detainees medically necessary transfers to a medical facility;

     h.     A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for detainees;

     i.     A policy, custom or practice that tolerates and allows abuse and neglect of prisoners and detainees and creates a dangerous condition for those in their care.

65.     In addition to the foregoing, Defendants were deliberately indifferent toward the proper training, equipping, and supervision of its employees and agents.

66.     In addition to the foregoing, Sheriff Warrell and other individually named defendants' (in) actions are attributable to the County under 42 U.S.C. § 1983 because they were at all times acting as the final policymaking authority for the jail.

67.     The above-described customs, practices and policies of Defendants posed a substantial risk of causing substantial harm to Minidoka and Cassia county inmates, and Defendants were subjectively or objectively (constructively) aware of that risk.

68.     Stephanie Eads's estate is entitled to compensatory damages in amount to be determined by the jury and punitive or exemplary damages against the individual defendants.

69.     As the result of Defendants' unlawful actions, Plaintiffs have had to retain experienced civil rights counsel.

### THIRD CLAIM FOR RELIEF
*42 U.S.C.§ 1983*
*Violation of the 14th Amendment*
*(Defendants Heward and Warrell and other individually named defendants)*

70.     Plaintiffs incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

71.     Defendants Heward and Warrell were responsible for supervision and training of the Jailer defendants throughout Stephanie Eads's incarceration. They were aware of the policies, customs and practices as alleged above, and that said policies, customs or practices created a substantial risk of causing substantial harm to Minidoka and Cassia county detainees. Despite this knowledge, Sheriff Heward and facility director Warrell and other individually named defendants promulgated, allowed, approved of, and/or ratified said policies, customs or practices.

72.     Warrell and other individually named defendants failed to properly supervise his subordinates resulting in the abuse, neglect and damages alleged herein, including, but not limited to, Stephanie Ead's otherwise avoidable death.

73.     Warrell and other individually named defendants failed to adequately train jail personnel in the need for medical treatment for physically ill detainees when they are booked into jail; training of the necessity of ensuring prompt medical and psychological treatment for detainees; or to recognize emergency medical situations. Warrell and other individually named defendants were aware that their failure to train created a substantial risk of harm to Minidoka and Cassia County

detainees.

74.     As a direct and proximate result of the actions and/or inactions of Warrell and other individually named defendants Stephanie Eads was deprived of necessary hydration, medications, and as a result thereof suffered severe physical, mental, and emotional distress prior to her death.

75.     The estate of Stephanie Eads is entitled to compensatory damages in an amount to be determined by the jury at the time of trial.

76.     As the result of Defendants' unlawful actions, Plaintiffs have had to retain experienced civil rights counsel.

77.     Warrell and other individually named defendants' (in)actions were reckless and callously indifferent to Stephanie Eads's constitutional rights, and punitive damages are appropriate to deter such conduct

## FOURTH CLAIM FOR RELIEF

*Idaho Code§ 6-903 All*
*Defendants*

78.     Plaintiffs incorporate by reference all other **paragraphs** of this Complaint as if fully set forth herein.

79.     At all times hereto, and in performance of the acts and omissions set forth herein, the individual Defendants were acting within the course and scope of their employment with defendant Minidoka and Cassia county, and/or within the scope of a contract with the County.

80.     Minidoka and Cassia counties are responsible for the wrongful (in)actions of each of the individual defendants named herein.

81.     As described above, the defendants acted in a manner that was grossly negligent, reckless, willful and wanton and with malice, directly causing Stephanie Eads's death.

82.     As described above, each of the individual defendants made a conscious choice as to his or her course of action, under circumstances where the risk and high probability of harm were objectively foreseeable (and, in fact, subjectively known).

83.     The estate of Stephanie Eads is entitled to compensatory damages in an amount to be determined by the jury at the time of trial.

84.     Carol Cole and all other Plaintiff entities are each entitled to compensatory (wrongful death) damages for the loss of Stephanie Lynn (king) Eads as described above.

85.     Based on the foregoing statements Defendants named are liable for compensatory and punitive damages for their creation of the actual, particularized danger that Plaintiff endured, done deliberately or with deliberate indifference toward her safety and well-being in conduct that shocks the conscious. The physical and mental damages and indeed torture were so intentional, open and obvious that any average person of intellectual ability would have not so acted; the acts and failure to act were a violation of the Equal Protection Clause/Equal Educational Opportunities Act of 1974.

## FIFTH CLAIM OF RELIEF

*Denial of Equal Protection (42 U.S.C. Sec.1983)*
*Individual and Monell*

86.     The Defendant violated the Equal Protection Clause and the Due Process Clause of the 14th Amendment of the United States Constitution in their deliberate indifference to the treatment of the Plaintiff.

87.     The governmental entities named herein received federal funds to protect Plaintiff. The counties acting in joint concert and their agents and employees in their individual and representative capacities, acted with deliberate indifference to the physical abuse and mistreatment of the Plaintiff. The defendants deprived Stephanie of her liberty and property interests under the Due Process Clause of the United States Constitution. The governmental entities named herein acted with extreme indifference and abject dismissive actions, which shocks the conscious.

88.     The deliberate indifference and negligent actions of the governmental entities named herein and the individuals also named exposed Stephanie to her untimely and totally preventable death. At all times before, during and after these events the governmental entities named herein and the individual defendants were acting under color of state law.

89.     The governmental entities named herein had policy-making authority and by not exercising it properly they permitted, endorsed and ratified the absence of rules and conduct, which would have prevented the death of Stephanie Eads.

90.     The governmental entities named herein failed to adequately train employees to recognize, anticipate and prevent the withholding of medical care and treatment resulting in the deprivation of rights suffered by Stephanie and the plaintiffs herein and they were deliberately indifferent to the obvious consequences of failure to train employees.

91.     As a result of the actions and omissions of the governmental entities named

herein the Plaintiff has suffered damages in an amount to be proved at trial.

92.     Based on the paragraphs set forth and alleged above, the governmental entities named herein is liable for compensatory and punitive damages for its actions in failing to promulgate, issue, and enforce appropriate procedures and policies, including but not limited to; safely protecting Stephanie at all times which was done in deliberate indifference and for its actions in failing to adequately train, monitor, or supervise its administrators and staff to ensure that medical needs of inmates were met including those of Stephanie, all in violation of the Ninth and Fourteenth Amendments and 42 USC § 1983.

## SIXTH CLAIM FOR RELIEF

*Violation of Title II of the Americans with Disabilities Act (ADA) (Defendant Minidoka and Cassia County Sheriffs' Departments operating under the joint agreement for operation of the Mini-Cassia Justice Center)*

93.     Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

94.     The Cassia and Minidoka County Sheriffs' Department operating jointly and in cooperation as the Mini-Cassia Justice Center are public entities subject to the Americans with Disabilities Act.

95.     Amputation of a hand and limb are a disability under the ADA.

96.     Stephanie was subject to the custody and control of the Cassia and Minidoka County Sheriffs' Department operating as the Mini-Cassia Justice Center from January 7, until her death on January 24 2020.

97.     Throughout her time in custody, Stephanie was a qualified person with a **disability,** including because she had a physical or mental impairment that substantially limited one or more major life activities.

98.     Because of enhancing the danger to her life by not having the jail staff including any medical personnel available recognize Stephanie's disability and her still healing amputation stump, the Cassia and/or Minidoka County Sheriffs' Department personnel intentionally discriminated against her by failing to provide her with adequate treatment for her medical conditions and were deliberately indifferent to her serious medical needs.

99.     The Cassia and Minidoka Sheriff's Department operating as per a joint operating agreement at the Mini-Cassia Justice Center, refused to make reasonable accommodations for Stephanie, including by failing to provide her with a medically adequate oversight program with

diagnostic treatment including but not limited to blood testing, which would have readily shown her to be suffering from the deadly disease and fungi growth in her bloodstream leading· to the infective endocarditis which was easily treated as well as the staph infection from the filthy conditions of the detention cell.

100.   The unlawful discrimination caused Stephanie to experience pain, suffering, and death. As a result of the defendant's actions, Stephanie and her next of kin suffered the damages described in all foregoing paragraphs and statements.

## PRAYER FOR RELIEF ON ALL COUNTS

WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

A.     Economic and noneconomic damages to the estate of Stephanie Eads under all Claims for Relief, as deemed appropriate by a jury in a sum of not less than $25,000,000 dollars.

B.     An award of such damages as under all the circumstances of the case may be just to Carol Cole and all other Plaintiffs individually, as provided under applicable law and deemed appropriate by a jury;

C.     Punitive damages under the First and Second Claims for Relief, and under Idaho state law if amendment to assert such a claim is granted;

D.     Attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988, and pursuant to Idaho law and equity to the extent they are available thereunder;

E.     Costs as provided under applicable law;

F.     Pre-judgment and post-judgment interest as provided under applicable law;

G.     All other equitable relief deemed just and appropriate by the Court.

H.     An award of non-economic damages as prayed for above, in the sum of not less than Five Million Dollars per each plaintiff and survivor of Stephanie Lynn (king) Eads including all children, mother, sisters and all others entitled to recover from and for, the Estate of Stephanie Lynn (king) Eads as and for her wrongful death and the taking of her 8th and 14th Amendment Rights as per the Constitution of the United States of America; and further exemplary and/or punitive damages.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to assert additional claims as may be appropriate following

further investigation and discovery and any defendant's responsive pleading.

## JURY DEMAND

As a right and privilege afforded by the Federal Rules of Civil Procedure Plaintiff demands that this action be tried before a jury.

Respectfully Submitted this 14 day of May 2020.

E. Lee Schlender, Attorney for Plaintiff Carol Cole

### AMENDED AND RESTATED
# JOINT POWERS AGREEMENT

### AS AMENDED FEBRUARY 2001 and JUNE 2015

**JOINT POWERS AGREEMENT BETWEEN COUNTY OF MINIDOKA, IDAHO AND COUNTY OF CASSIA, IDAHO FOR JOINT CORRECTIONS/DETENTION OPERATION.**

This Amended and Restated Agreement is made the date and year written below as an amendment to that certain Joint Powers Agreement made and entered into between the parties on August 27, 1990, and amended February, 2001. The parties have since that date operated Joint Juvenile and Joint Adult Detention Facilities pursuant to said agreement. This Amended and Restated Joint Powers Agreement is entered into to further define and clarify the rights, responsibilities and obligations of the parties and their employees and to conform the agreement to the actual practices of the parties regarding the operation and administration of the facilities, based upon the practical experience of the parties since 1990. This joint powers agreement by and between the County of Minidoka and the County of Cassia, each organized and existing under the laws of the State of Idaho, states:

**a.** Each county which is a party to this agreement supports at the present time a law enforcement agency under the direction of its elected sheriff for the apprehension of criminals within its jurisdiction and incarcerates such prisoners pending trial and by order of the District Court of the Fifth Judicial District and the Magistrate Courts located in the respective counties.

**b.** The old county jails of the respective counties have been replaced by a modern jail facility constructed jointly by the County of Minidoka and the County of Cassia located in the City of Burley, Idaho near the Cassia County Courthouse and law enforcement facilities. This new joint-jail facility is operated, maintained and managed by a department accountable to the board of county commissioners of each county and the elected county sheriffs of each county.

**c.** The parties hereto have established a juvenile detention center at the site of the old Minidoka County Jail facility in the City of Rupert near the former courthouse and law enforcement facilities. The Counties have jointly remodeled the jail facility into a modern juvenile detention facility and the juvenile detention facility is operated, maintained and managed by a department accountable to the boards of county commissioners of each of the counties and the elected sheriff of each county.

# Exhibit A
# cole v. cassia co.

Page 1 of 14

# ARTICLE I

**THEREFORE,** it is agreed between Minidoka County, Idaho and Cassia County, Idaho as follows:

**1.** That the parties have established and by this agreement do hereby continue the Joint Minidoka/Cassia County Detention Department. This department shall continue to manage the jointly owned detention facility for the detention of adult offenders located in the City of Burley, County of Cassia.  The department shall further continue to operate and manage a juvenile detention facility owned by Minidoka County and jointly operated by Minidoka and Cassia Counties, located in the City of Rupert, County of Minidoka. The maintenance, operation and management of said Joint Adult Detention Facility and Joint Juvenile Detention Facility shall be upon the terms, conditions and specifications hereinafter set forth in this Joint Powers Agreement.

**2.** The Minidoka/Cassia County Detention Department shall be directed and governed by an executive board, the composition of which shall be as follows:

**(a)** The elected sheriff of Minidoka County, Idaho.

**(b)** The elected sheriff of Cassia County, Idaho.

**(c)**  One member of the elected Board of County Commissioners of Minidoka County, Idaho, to be designated by such Board.

**(d)** One member of the elected Board of County Commissioners of Cassia County, Idaho, to be designated by such Board.

**(e)**  The chairman of the executive board shall be the elected Prosecuting Attorney of Minidoka County, Idaho in even numbered years and the elected Prosecuting Attorney of Cassia County, Idaho in odd numbered years. The chairman shall be entitled to vote only in the event of a tie vote among the other members. The prosecutor who is not serving as chairman shall attend and participate in all Board meetings as a non-voting participant.

**(f)**  If any of the foregoing elected officials are unable to attend a Board meeting they may designate a sworn deputy or in the case of the County Commissioners, another elected Commissioner, to replace them at the meeting and to vote in their place.

**3.** The executive board of the Joint Minidoka/Cassia County Detention Department shall be responsible for:

**(a)** Hiring supervising and disciplining the directors for the Joint Adult Detention Facility and the Joint Juvenile Detention Center and supervising the work of the directors.

**(b)** Establishing the policies and procedures necessary for operation of the Joint/Detention Department;

(c) Complying with all city, county, state, and federal statutes and regulations, respectively, with respect to care, and custody of adult prisoners and juvenile offenders;

(d) Overseeing the management of the operation of the Joint Adult Detention Facility;

(e) Overseeing the management of the operation of the Joint Juvenile Detention Facility;

(f) Consulting with the Directors of the facilities regarding all personnel working in the Joint Adult Detention Facility and the Joint Juvenile Detention Facility;

(g) Establishing a budget for the administration and operation of the Detention Department and the facilities managed thereby and overseeing the operation of the department within the scope of that budget;

(h) Determining the cost of operation of the department and the respective facilities managed thereby and to cause appropriate accounting and book keeping procedures to be implemented documenting such costs;

(i) Overseeing the preparation of the necessary contractual documents between the counties and other governmental jurisdictions for the care and custody of persons requiring detention;

(j) Providing for a method to give legally required medical care for all adult prisoners and juvenile offenders;

(k) Approving and authorizing appropriate rehabilitation, training and education programs for adult prisoners and juvenile offenders;

(l) Coordinating the administration of the Detention Department with the sheriff's departments of the respective counties and other law enforcement agencies operating within the respective counties;

(m) Approving and authorizing methods to maintain the prisoner population of the adult and juvenile detention facilities at a manageable level, while taking care to insure the security of persons committed therein and seeking to establish and maintain alternative methods of detention and disposition of prisoners in the least restrictive manner, while at the same time maintaining the public safety and welfare uppermost;

(n) Issuing a quarterly written report to the Boards of County Commissioners of the respective counties, detailing the operation of the department for the preceding quarter to include, but not be limited to reports on inmate population, expenses of the department and the individual facilities, present and projected budget expenses, items of potential legal or fiscal impact or other items deemed necessary by the executive board as important for the knowledge of the County Commissioners.

## ARTICLE  II
### JOINT ADULT DETENTION FACILITY.

**1. THE FACILITY:**

Minidoka and Cassia County have constructed in the City of Burley, County of Cassia, State of Idaho, a Joint Adult Detention Facility which is jointly owned, operated and maintained by the counties under the terms and conditions set forth in this agreement. The name of the facility is "The Mini-Cassia Criminal Justice Center."

**2. COSTS OF CONSTRUCTION:**

(a) Each county has contributed to and participated in all costs of the design and construction of the Joint Adult Detention Facility in approximately equal shares. The counties have, (having received electorate approval,) issued bonds to finance their obligations to equally share the costs of construction.

(b) Since Minidoka County was required to expend general revenue bond funds on the construction and remodeling of the Joint Juvenile Detention Center under Article III, paragraph 2.a of this agreement, Cassia County has contributed an equal amount of funds generated from the sale of its general obligation bonds to the initial costs of construction of the Joint Adult Detention Facility to equalize the two counties' overall contributions to the two facilities.  All other costs incurred in the design and construction of the Joint Adult Detention Facility have been born by the two counties in equal shares.

**3. COSTS OF OPERATION AND MAINTENANCE:**

(a) Each county will share equally all costs incurred in the care, upkeep, maintenance, remodeling, renovation or improvement of the physical facilities constituting the Joint Adult Detention Facility which shall include all lands, buildings, equipment and vehicles relating thereto.

(b) The parties shall share the costs of operation and management of the Joint Adult Detention Facility which shall include, but not be limited to, personnel costs (direct and indirect), administration costs, supplies, medical services, utilities, food, clothing and bedding in accordance with the following formula:

Each county's proportion of the costs to be paid hereunder for each fiscal year thereafter shall be established in proportion to each county's share of the total inmate population of both counties held in the adult detention facility for that calendar year ending the preceding December 31. For the purposes of calculation of the respective proportions of inmate population, an inmate shall be chargeable to that county having jurisdiction over the offense upon which the inmate is originally arrested and incarcerated, regardless of the filing of subsequent charges, holds, or warrants against the inmate during his/her stay of incarceration.

## 4. MANAGEMENT OF THE JOINT ADULT DETENTION FACILITY:

The Cassia County Sheriff shall be the immediate director of the facility and has the primary responsibility for the day to day management of the Joint Adult Detention Facility subject to the terms of this agreement and shall be accountable to the executive board therefore. The Cassia County Sheriff shall assist the executive board in carrying out its duties under Article I paragraph 3 of this contract. Specifically, the Sheriff shall be responsible for:

(a) Implementing the policies necessary for operation of the Joint Adult Detention Facility.

(b) Complying with city, county, state and federal statutes with respect to care and custody of prisoners.

(c) Reporting to and receiving direction from the Executive Board.

(d) Managing the day to day operation of the Adult Detention Facility.

(e) Meeting regularly with the Executive Board to review operations, budget, and to discuss problems and the operation of the Joint Adult Detention Facility.

(f) Conferring with the Executive Board in establishing a budget for the administration and operation of the Joint Adult Detention Facility.

(g) Providing appropriate medical care as required by law for all prisoners in the Joint Adult Detention Facility.

(h) Establishing appropriate rehabilitation and training programs for inmates in the Joint Adult Detention Facility.

(i) Coordinating the administration of the Joint Adult Detention Facility with Minidoka and Cassia County Law Enforcement Agencies and other law enforcement agencies using the facility.

(j) Advising the Executive Board of new developments in penology and criminological treatments and participating with other agencies, state, federal and regional on matters related thereto as approved by the Executive Board.

(k) Actively seeking to maintain the prisoner population at the Joint Adult Detention Facility at a manageable level while taking care to insure the security of prisoners committed therein and seeking to establish and maintain alternative methods of detention and disposition of prisoners in the least restrictive manner while at the same time maintaining the public safety and welfare uppermost.

(l) Issuing a monthly report to the Executive Board detailing the operations of the Joint Adult Detention Facility. The report should include, but not be limited to, reports on inmate population, and items of potential legal or fiscal impact or other items deemed necessary for the Executive Board's knowledge.

## 5. EMPLOYEES:

**(a)** All employees of the Joint Adult Detention Facility are to be Cassia County employees.

**(b)** The staff and employees who work in the Joint Adult Detention Facility shall be under the supervision of the Cassia County Sheriff regarding the performance of their job duties.   The Sheriff shall have responsibility for administering sick leave, vacation time, paid time off, compensation time, and other employee administrative matters for employees working in the facility.  The Cassia County Sheriff shall have the responsibility to administer employee discipline and discharge facility employees.  The Sheriff shall annually, or more often if deemed necessary, undertake employee performance evaluation interviews with other facility employees and report to the Executive Board thereon.

**(c)** Employee grievances regarding supervisory actions or decisions or disputes among employees in the facility shall be handled in the following manner:

   **(i)**    The parties to the grievance or dispute shall first attempt to resolve the matter informally between themselves.

   **(ii)**   In the event that the parties to the dispute cannot resolve the matter informally, then the matter shall be submitted to the Cassia County Sheriff to hear all sides of the issue and to resolve the issues.   The Sheriff's resolution shall be the final administrative step in the resolution process.

**(d)**  The Cassia County Sheriff or designee, the Minidoka County Sheriff or designee,  the Cassia County Prosecutor or designee, and the Minidoka County Prosecutor or designee shall screen all applicants selected for interview.  Once they have selected an applicant, the applicant shall be approved by the Joint Adult Detention Executive Board before being hired.  Approval must be by a majority vote.  If the hiring of the applicant is approved the matter shall be forwarded to the Cassia County Commissioners who shall make the final hiring decision and approve funding for the position.

## 6. FISCAL ADMINISTRATION ACCOUNTING AND AUDITING:

Responsibility for the fiscal administration, accounting, auditing and financial affairs, including payment of bills and expenses for the Joint Adult Detention Facility shall be assumed and carried out by the Cassia County Clerk/Auditor's Office. Copies of all accounts, audits and other records so kept shall be provided on a quarterly basis to the Executive Board for review.

# ARTICLE III

## JOINT JUVENILE DETENTION CENTER.

### 1. THE FACILITY:

The parties have established a Joint Juvenile Detention Center at the location of the former Minidoka County Jail to house juvenile offenders from both counties. The counties obtained a grant from the State of Idaho to assist in the construction of the Joint Juvenile Detention Center. The name of the facility is "The Mini-Cassia Juvenile Detention Center."

### 2. CONSTRUCTION COSTS:

**a.** The costs of construction of the Joint Juvenile Detention Center were paid from grant funds from the State of Idaho to the extent that such funds were available for the construction of the center. Since the grant funds were insufficient to fully complete the alteration, remodeling and construction of the Joint Juvenile Detention Center, the costs of such construction were born by Minidoka County from funds obtained through issuing the general obligation bonds of the county and matched by Cassia County in unilateral contributions to the construction of the adult facility. The real estate, building and fixtures used in the Joint Juvenile Detention Center are and shall remain the sole property of Minidoka County.

**b.** It is understood and agreed between the parties that capital expenditures made for the Joint Juvenile Detention Center after the initial construction phase was completed and during the course of this agreement have been and shall continue to be made only with the consent of both counties thereto and such expenses have and shall be paid equally by both counties.

### 3. MANAGEMENT OF JOINT JUVENILE DETENTION CENTER:

The Director hired by the Executive Board shall have the primary responsibility for the day to day management of the Joint Juvenile Detention Center subject to the terms of this agreement and shall be accountable to the Executive Board therefore. The director shall assist the Executive Board in carrying out its duties under Article I paragraph 3 of this contract. Specifically, the director shall be responsible for:

**(a)** Implementing the policies necessary for operation of the Joint Juvenile Detention Center.

**(b)** Complying with city, county, state and federal statutes and regulation with respect to care and custody of juveniles.

**(c)** Reporting to and receiving direction from the Executive Board.

**(d)** Managing the day to day operation of the Juvenile Detention Center.

(e) Meeting regularly with the Executive Board to review operations, budget, and to discuss problems and the operation of the Joint Juvenile Detention Center.

(f) Conferring with the Executive Board in establishing a budget for the administration and operation of the Joint Juvenile Detention Center.

(g) Providing appropriate medical care as required by law for all juveniles detained in the Joint Juvenile Detention Center.

(h) Establishing appropriate rehabilitation and training programs for juveniles detained in the Joint Juvenile Detention Center.

(i) Coordinating the administration of the Joint Juvenile Detention Center with Minidoka and Cassia County Law Enforcement Agencies and the Joint Juvenile Probation Department,  and other law enforcement agencies using the facility.

(j) Advising the Executive Board of new developments in juvenile rehabilitation and treatment and participating with other agencies, state, federal and regional on matters related thereto as approved by the Executive Board.

(k) Actively seeking to maintain the juvenile population at the Joint Juvenile Detention Center at a manageable level while taking care to insure the security of juveniles committed therein and seeking to establish and maintain alternative methods of detention and disposition of juveniles in the least restrictive manner while at the same time maintaining the public safety and welfare uppermost.

(l) Issuing a monthly report to the Executive Board detailing the operations of the Joint Juvenile Detention Center. The report should include, but not be limited to, reports on juvenile population, expenses of the facility, income of the facility present and projected budget expenses, items of potential legal or fiscal impact or other items deemed necessary for the executive board's knowledge.

## 4. COSTS OF OPERATION AND MAINTENANCE:

It is agreed that the costs of operation and management of the Joint Juvenile Detention Center which shall include but not be limited to personnel costs (direct and indirect) administration costs, supplies, medical services, utilities, food, clothing and bedding shall be shared between the parties as follows:

Commencing with the fiscal year beginning on October 1, 1996, the parties shall share the costs of operation and management of the Joint Juvenile Detention Center after deducting all other revenues according to that proportion which the juvenile detainee population from each county bears to the total juvenile detainee population from both counties in the juvenile detention facility during the calendar year ending December 31, 1995. For each subsequent fiscal year during the period of this agreement, each county shall pay that proportion of the expenses of operation and maintenance of the Joint Juvenile Detention Center which that county's juvenile detainee population bears to the total detainee population of both counties in

the calendar year ending on December 31, prior to the commencement of the fiscal year in question. For the purposes of this paragraph, a juvenile detainee shall be deemed to be an detainee of that county having jurisdiction over the offense for which the juvenile was initially detained regardless of the filing of subsequent charges in other jurisdictions which may occur thereafter during the period of detention.

## 5. EMPLOYEES:

(a)  All employees of the Joint Juvenile Detention Center shall be employees of Minidoka County, Idaho.

(b) The staff and employees who work in the Joint Juvenile Detention Center shall be under the supervision of the Minidoka County Sheriff and the Director appointed by the Executive Board regarding the performance of their job duties.   The Director shall have responsibility for administering sick leave, vacation time, compensation time,  and other employee  administrative matters for employees working in the Center.  The Director,  in consultation with the Minidoka County Sheriff,  shall  have the responsibility to administer employee discipline and discharge Center employees.  The Minidoka County Sheriff shall annually evaluate the employment performance of the Director and report to the Executive Board on such evaluation.  The Director shall annually, or more often if deemed necessary, undertake employee performance evaluation interviews with other Center employees and report to the Executive Board thereon.

(c)  Employee grievances regarding supervisory actions or decisions or disputes among employees in the Center shall be handled in the following manner:

i.    The parties to the grievance or dispute shall first attempt to resolve the matter informally between themselves.

ii.    The employees shall take the matter to the Director, who after hearing all sides to the issue, shall attempt to resolve the matter.  If the grievance or dispute involves the Director's decisions or actions, the matter shall be submitted to the Minidoka County Sheriff to hear all sides of the issue and attempt to resolve the issues.  If any of the parties involved in the grievance or dispute believes that the matter should be heard by someone other than the Sheriff, they shall so inform the Sheriff and the matter shall be heard by the an independent person designated by the County to hear such matters.

iii.    If the parties are unable to informally resolve the matter through the previous steps, the matter shall be submitted in writing by the grievant to the Board of County Commissioners of Minidoka County for resolution under the county's grievance procedure.

(d)   The Minidoka County Sheriff or his designee, the Minidoka County Prosecutor or his designee and the Director of the facility shall screen all applicants and shall interview the applicants selected for interview.  Once they have selected an applicant, the applicant can be hired by the Director, subject to ratification by  the Joint Adult Detention Executive Board for ratification.  Ratification must be by a majority vote.  If the hiring of an

applicant is ratified the matter shall be forwarded to the Minidoka County Commissioners who shall made the final hiring decision and approve funding for the position.

## 6. FISCAL ADMINISTRATION ACCOUNTING AND AUDITING:

Responsibility for the fiscal administration, accounting, auditing and financial affairs, including payment of bills and expenses for the Joint Juvenile Detention Center shall be assumed by the Minidoka County Clerk/Auditors Office. Copies of all such accounts audits and other records shall be provided on a quarterly basis to the Executive Board for review.

**ARTICLE IV**
**FINANCE AND BUDGETING**

## 1. ANNUAL BUDGET:

**a.** A proposed annual budget for the two facilities shall be submitted by the facility administrators to the Executive Board by the 2nd Tuesday in May of each year.

**b.** The proposed budget for the two facilities shall be submitted by the Executive Board to the respective boards of county commissioners of the two counties by July 1st of each year. The boards of county commissioners of the two counties shall hold a joint public meeting on the proposed budgets of the facilities and the members of the executive board shall attend the meeting and explain the budget request to the respective boards of county commissioners.

**c.** The two boards of county commissioners shall agree in writing by the fourth Monday in July of each year as to an approved budget for the facilities. If the budget approved by the Board of County Commissioners of Minidoka County and that approved by the Board of County Commissioners of Cassia County are different, each body shall appoint one member to serve with the Clerks as a conference committee to discuss the matter and report back to the respective boards of county commissioners with an alternate proposal. In any event an approved budget must be agreed upon in writing by August 1st of each year by the boards of county commissioners of both counties after such conferences and deliberations. If a mutually agreeable budget has not been approved prior to the start of the fiscal year to which that budget is applicable, no monies will be spent or encumbered by the facilities or the Directors until the budget is approved and agreed upon by the boards of county commissioners of both counties.

**d.** If during the course of a fiscal year a facility submits a request for a change to its budget, such requests shall, after approval by the Executive Board, be presented to the boards of county commissioners of both counties. A matter of budget adjustment must be approved by the boards of county commissioners of both counties before it can take effect. If both boards of county commissioners cannot agree concerning the request, such difference shall be submitted to a conference committee composed of one member of the board of county commissioners from each county and the respective county clerks or their designees. This conference committee shall submit its recommendations to the respective boards of county commissioners for final determination. If no uniform agreement is reached concerning the request, the action shall be deemed "not approved".

**2. PAYMENT:**

The Clerk/Auditor of Cassia County and the Clerk/Auditor of Minidoka County shall meet semi-annually to settle accounts between the two counties regarding the expenses of the operation of the Joint Adult Detention Facility and the Joint Juvenile Detention Center for the previous quarter. At such time the amount which Cassia County owes to Minidoka County for the operation and maintenance of the Joint Juvenile Detention Center for the previous quarter shall be established and such payment shall be made by Cassia County to Minidoka County immediately following the meeting of the Board of County Commissioners of Cassia County on the second Monday of the month following the end of the six month period in which the expenditures were incurred.

At such time, there shall also be established the amount which Minidoka County owes to Cassia County for the operation and maintenance of the Joint Adult Detention Facility for the previous quarter. Such sums shall be paid by Minidoka County to Cassia County immediately following the meeting of the Board of County Commissioners of Minidoka County on the second Monday of the month following the end of the quarter in which the expenditures were incurred.

**3. YEAR END RECONCILIATION:**

At the end of each fiscal year, the Clerk/Auditor of Cassia County and the Clerk/Auditor of Minidoka County shall meet and reconcile all accounts between the counties for the operation of the two joint detention facilities for the previous year and a report of the same shall be provided to the boards of county commissioners of the respective counties. At that time if any payment be required from either county to the other in order to reconcile the accounts and to comply with the terms of this contract regarding the allocation of costs and expenses, such payment shall be made no later than the second Monday in October following the close of the fiscal year.

# ARTICLE  V

## MISCELLANEOUS PROVISIONS

**1. LIABILITY:**

The parties hereto shall be jointly liable and responsible for all damages to persons or property that occur as a result of or in the course of the operation of the Joint Facilities, including judgments rendered in a court of competent jurisdiction for claims against any employee or official of the facilities, the department, or any facility or property of or under the control or management of the department. Cassia County shall have the responsibility to adjust and defend claims arising out of the operation of the Adult Detention Facility.  Minidoka County shall have the responsibility to adjust and defend claims arising out of the operating of the Joint Juvenile Detention Center.

## 2. INSURANCE:

The Joint Adult Detention Facility and the Joint Juvenile Detention Center shall be insured by the insurance coverages of the respective counties. The cost of insurance premiums paid to insure the jointly operated facilities and the Detention Department and costs of deductibles paid or claims handled and paid relating to the operation of the Detention Department shall be included as a cost of operation of the department and shall be paid equally by the counties.

## 3. DURATION AND TERMINATION OF THE CONTRACT:

The term of this Amended and Restated Joint Powers Agreement contract shall be for a period of 24 years from the date of execution of the contract. This agreement may be terminated by either county by giving the other entity notice at least 12 months in advance of the end of the fiscal year in which the agreement is to be terminated. In the event of termination of this agreement, distribution of the properties owned jointly by the counties or by either Cassia County or Minidoka County which are used in the operation of the Detention Department shall be determined by agreement of the parties, or by a court of competent jurisdiction if the parties cannot agree.

## 4. AMENDMENTS AND MODIFICATIONS:

It is understood by both counties which are parties hereto that matters not presently contemplated by this agreement will necessarily be involved in the future administration of this agreement. This agreement may be modified or amended by agreement of the parties by majority vote of the boards of county commissioners of the respective counties.

## 5. INTENT AND LEGAL REQUIREMENT:

Both of the counties which are parties hereto must comply with certain legal requirements with respect to financing and debt limitations. Specifically, although it is the intent of the parties to enter into this contract under the finding by the respective governing bodies in the exercise of their constitutional authority that this contract constitutes an ordinary, necessary expenditure, the financing of this contract under the terms of this agreement does not constitute an indebtedness or liability beyond any fiscal year of the parties in order to preserve the discretion of future boards of county commissioners for the respective counties with respect to this and other expenditures, but that the intent of this agreement is to afford the future administrations of the parties the opportunity to continue this agreement for the full term of the agreement if in the discretion of such future administrations it is then in the best interest of the public whom they serve.

Not withstanding other provisions of this agreement if either county which is a party hereto does not provide sufficient funding pursuant to the legal budgeting process to fund the requirements of this agreement, then in such event this agreement shall terminate. This provision shall be applicable to a budget that is either increased or decreased by either party in the final budget adoption process.

**6. JUDICIAL INVALIDITY:**

        If this agreement shall be declared in whole or in part invalid by any court of competent jurisdiction, then in such event the agreement shall be renegotiated or, failing renegotiation it shall terminate, provided that if such occurs, unless otherwise ordered by the court the provisions of paragraph 3 Article VI shall be carried out by the parties.

**7. ADMINISTRATION OF THE AGREEMENT:**

        The Executive Board is charged with the administration of this agreement and shall issue policy statements, letters of understanding, and supplements to this agreement in order to provide for satisfactory administration of the agreement. Such letters, supplements or memos shall be subject to the approval of the boards of county commissioners of the respective parties.

**8. PERSONAL PROPERTY AND EQUIPMENT:**

        Upon implementation of the original agreement both counties transferred for the use of the joint Minidoka/Cassia County Detention Department, property and equipment then in the possession of the counties which facilitated the functioning of the Detention Department. The property to be transferred to the department by Minidoka County was listed on Exhibit A to the original agreement. The property transferred to the department by Cassia County was listed on Exhibit B to the original agreement. Such transfers were made under the authority of Idaho Code 67-2322 through 67-2324 and both parties prior to the transfer, took the necessary steps to comply with the said statutes.

        **IN WITNESS WHEREOF** The County of Cassia by resolution of its Board of County Commissioners has caused these presents to be subscribed by the chairman of the board and the seal of said board to be affixed thereto and attested by the clerk of said board and the County of Minidoka by resolution of its Board of County Commissioners has caused these presents to be subscribed by the chairman of the said board and the seal of said board to be affixed thereto and attested by the clerk of said board on the day and year designated below.

**COUNTY OF MINIDOKA**

By _____
      Robert D. Moore, Chairman

**ATTEST:**

By _____
    Patty Temple - County Clerk

          **DATED SIGNED** 6-1-2015

**COUNTY OF CASSIA**

By _Denis D Crane_

Dennis D Crane, Chairman

**ATTEST:**

By _Joseph W. Larsen_

Joseph W. Larsen, Clerk

DATE SIGNED _June 1 - 2015_

   This contract was ratified by the County Commissioners of Minidoka County at its regular meeting held pursuant to notice on the _1st_ day of _June_ , 2015.

   This contract was ratified by the County Commissioners of Cassia County at its regular meeting held pursuant to notice on the _1st_ day of _June_ , 2015.

## INDEPENDENT MEDICAL SERVICES CONTRACT
### [Medical Health Authority Taylor McAllister – 2018; amended June, 2019]

Mini-Cassia Criminal Justice Center for Cassia County, hereinafter referred to as "Jail" and Taylor McAllister, a physician assistant, licensed by the State of Idaho and under the supervision of Dr. Basil Anderson, M.D., hereinafter referred to as AMedical Health Authority", enter into this agreement effective the 1st day of October, 2018, with amendments effective June 1, 2019.

The Mini-Cassia Criminal Justice Center contracts with the Medical Health Authority for a term of 1 year effective the first day of  June, 2019 and ending the 31st day of September, 2019, for the monthly consideration of Two Thousand Three Hundred Eighty One Dollars and Seventy-Two Cents ($2381.72), payable in monthly payments, such payments to be made by the 15th of each month during the term of this agreement. The term of this agreement shall be extended from year to year thereafter (except as otherwise provided herein) unless terminated by either party by written notice delivered to the other not less than 30 days prior to the termination day.

For each successive contract year, beginning on October 1, 2019, if the contract is extended, the monthly rate shall increase by an amount equal to three percent (3%).

A.  THE MEDICAL AUTHORITY AGREES TO:

1.  Meet on a quarterly basis with Jail Director and the facility medical staff to discuss procedural changes, policies, cooperative suggestions to better serve the inmates of the Mini-Cassia Criminal Justice Center.

2.  Assist the jail in meeting its duties to the inmates as stated in the standards for health services in the jail as set forth by the National Commission on Correctional Health Care, and relative American Corrections Association standards, which are intended to be used as guidelines. The Medical Authority shall also assist in meeting such duties imposed by Federal and State laws and regulations.

3.  Assist the Jail in developing and implementing policies that will assure high quality medical and nursing care. They will also prepare specific policies and procedures concerning the following:

    a.    Emergency treatment of inmates
    b.    Prescriptive medicines
    c.    Oversee the implementation of special diets regulated by the facility=s registered dietician.

# Exhibit  B
# cole v. cassia co.

4.  Approve and supervise regulation of all medical procedures conducted in the jail including:

|     |     |
| --- | --- |
| a. | Receiving and screening procedures |
| b. | Health appraisal data collection procedures |
| c. | Referrals of seriously ill inmates |
| d. | Provision of non emergency medical services |
| e. | Obtaining emergency medical and dental services |
| f. | Chronic care |
| g. | Convalescent care |
| h. | Preventive maintenance |
| i. | Referral of mentally ill or retarded inmates |
| j. | Detoxification |
| k. | The formulary for all medications |
| l. | Policy concerning medication administration |
| m. | Method of recording entries in the medical record |
| n. | The work of qualified medical personnel |
| o. | Dental care |
| p. | Deciding the emergency nature of illness or injury |
| q. | Delousing procedures |

5.  Approve the medical training programs for jail staff.  Jail and Medical Health Authority will agree upon training subjects and timing of training for staff.  For any training that exceeds the hours agreed upon in Section F, below, then additional compensation shall  be paid to Medical Health Authority for such training and shall be at rates comparable to those offered by outside training providers, and as agreed upon by the parties hereto, before any such training is undertaken.  This responsibility includes training of all persons administering medications in the jail and training of appropriate jail personnel in the following procedures:

|     |     |
| --- | --- |
| a. | Basic first-aid |
| b. | Cardio-pulmonary resuscitation |
| c. | Receiving screening |
| d. | Recognition of symptoms of common illnesses |

6.  Develop and be responsible for all standing medical orders.

7.  Approve all medical record forms.

8. Supervise the general health environment of the Jail and make recommendations to the Jail Director when unsatisfactory conditions are observed.

9. Render medical care and attend "Sick Call" no less than twice a week. When the Medical Authority is unavailable, another Doctor will be provided to meet the sick call obligation.

10. The Jail will pay reasonable costs for medical malpractice insurance. Medical Health Authority will provide proof of insurance covering PA's work at the Mini-Cassia Criminal Justice Center and conducted on Jail's behalf.

B. THE MINI-CASSIA CRIMINAL JUSTICE CENTER AGREES TO:

1. Implement policies which assure high quality medical care.

2. Provide adequate equipment (replacing the equipment when obsolete with updated equipment of similar character and utility), supplies, secretarial-assistance and office space.   Basic equipment shall include, but not be limited to: thermometers, blood pressure cuffs, stethoscope, ophthalmoscope, otoscope, percussion hammer, examining table, scale, gooseneck lamp, wash basin and transportation equipment.

3. Provide appropriate, clean space for private medical examination of inmates.

4. Provide space for the confidential storage of medical records, separate from confinement records.

5. Permit the Medical Health Authority to attend continuing medical education courses and meetings relative to the jail care of inmates. . Expenses to attend such courses and meetings are reimbursed by the jail in an amount not to exceed five hundred dollars ($500.00) per year.

C. No regulation of the MCCJC shall involve the Medical Director in any aspect of the correctional or disciplinary process which is not related to genuine medical concerns, or which would unduly restrict or compromise the medical judgment of the Medical Health Authority.

D. Nothing in this agreement shall prevent the Medical Health Authority from engaging in any medical practice apart from the jail.

E. This agreement shall terminate in the event the Medical Health Authority shall die or become mentally or physically unable to perform the duties required. If there is a dispute over the Medical Health Authority's mental or physical disability, it will be resolved under the arbitration clause of this agreement. This agreement shall terminate in the event that his license to practice medicine in the State of Idaho is revoked or suspended.

F.  At the time of this agreement, the Medical Health Authority and the jail acknowledge that the duties of the Medical Health Authority will require approximately  three (3) hours per week.

G.  This agreement may be amended at any time by mutual agreement of the parties. Before any amendment is valid, it must first be reduced to writing and designed by the parties involved.

## ARBITRATION

1.   All disputes which arise with regard to the interpretation of this agreement shall be referred to arbitration by an arbitration panel composed of the County Commissioners. The decision of the panel shall bind the parties to the controversy with the same force and effect as the decrees of a court having competent jurisdiction.

2.   This agreement and its performances shall be construed in accordance with and governed by the laws of the State of Idaho.

## RELATIONSHIP OF PARTIES

1.  The parties to this contract intend that the relation between them created by this contract is that of employer - independent contractor. No agent, employee, or servant of the Medical Health Authority shall be or shall be deemed to be the employee, agent or servant of County. County is interested only in the results obtained under this contract. The manner and means of conducting the work are under the sole control of Medical Health Authority. None of the benefits provided by County workers compensation insurance and unemployment insurance are available from County to the employees, agents, or servants of Medical Health Authority. Medical Health Authority will be solely and entirely responsible for his acts and for the acts of Medical Health Authority's agents, employees, servants and subcontractors during the performance of this contract.

    IN WITNESS WHEREOF, this agreement shall be made in duplicate originals with each party retaining one original. The parties have caused this agreement to be executed on the ___6___ day of ___June___ , 2019.

MEDICAL HEALTH AUTHORITY                    WITNESS:

                                            Signature: _____

By: _____                         Printed Name: _____
    Taylor McAllister

BOARD OF COMMISSIONERS
OF CASSIA COUNTY

By: _____
      Leonard M. Beck– Chair

Attest:

Joseph W. Larsen, Clerk

BOARD OF COMMISSIONERS
OF MINIDOKA COUNTY

By: _____
      Kent McClellan – Chair

Attest:

Tonya Page, Clerk



Lloyd Smith <lloyd@mtnwestrealty.com>

**Stephanie Lynn Eads**

lloyd@mtnwestrealty.com <lloyd@mtnwestrealty.com>
To: aubtekmom@yahoo.com

Fri, Jan 17, 2020 at 5:25 PM

Hi Debbie,

Reaching out on behalf of long time friends in hopes of getting help to Stephanie. She is in isolation and apparently not doing well at all. I'm sure you see this a lot but her family is very concerned she is going to die in there.

I don't know if you can tell me anything at all but just praying she is getting medical attention on a daily basis?

Her mon was told no one would looking in on her until Tuesday…She is so bad she's in a wheelchair and dehydrated so bad her lip is split and she can't stand. Please look into her condition or have some do it…she's made her mistakes, like we all have, but the Lord loves her as does her family and all want her to live, and find her purpose, and prayerfully, JESUS!

Thank you for caring,

Lloyd Smith
Broker/Owner
Mountain West Realty

658 Overland Ave

Burley, Id 83318
208-431-2930
www.mtnwestrealty.com

Exhibit  C
cole v. cassia co.



Exhibit  D
cole v. cassia co.



Exhibit E
cole v. cassia co.



Exhibit F
cole v. cassia co.