UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Carol Cole surviving mother individually and as representative of the Estate of Stephanie Lynn (King) Eads (deceased) and all heirs and survivors including sisters, children and grandchildren,<br><br>Plaintiff,<br><br>v.<br><br>Taylor McAllister, *et al.*,<br><br>Defendants. | Case No. 4:20-cv-00155-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

Before the Court is Taylor McAllister's Motion for Summary Judgment.[1] Dkt. 50. The Court held a hearing on the motion on May 11, 2020. For the reasons that follow the Court will grant the motion.

---

[1] McAllister objected to many of Plaintiff's exhibits as lacking foundation or being otherwise inadmissible. Plaintiff's exhibits are chaotic. Plaintiff only cited a handful of her filed exhibits in her brief or statement of facts. The Court gave Plaintiff an opportunity to cure the evidentiary defects, which she appears to have done, but did not allow her to amend her brief or statement of facts. The Court has cited several of Plaintiff's exhibits where the facts are not in dispute. The only exhibit relied on by the Court where facts are in dispute is Dr. Gulick's report, which the Court finds is admissible for purposes of summary judgment.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

### A.   Introduction

On January 8, 2020, Stephanie Eads was arrested for a probation violation and illegal possession of narcotics. Dkt. 55-12 at 7-9. Following her arrest, Eads was detained at the Mini-Cassia Criminal Justice Center (MCCJC) until January 24, 2020. Dkt. 50-3 at 66. On January 24, 2020, Eads died from staphylococcus aureus sepsis and endocarditis. Dkt. 50-3 at 129.

Following Eads' death, her mother, Carole Cole, brought suit under 42 U.S.C. § 1983, alleging McAllister and the other defendants were deliberately indifferent to Eads serious medical needs in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Dkt. 5.

All defendants filed motions for summary judgment. Dkt. 50, 51, 55. At the hearing on the motions the Court orally granted the County Defendants' motion, Dkt. 55, and Dr. Basil Anderson's motion, Dkt. 51. The Court reserved ruling on McAllister's motion. Dkt. 50.

### B.   Eads Incarceration and McAllister's Treatment of Her

On November 3, 2018, Stephanie Eads lost part of her left hand when she got it caught in a grinder. *See* 50-3 at 93. In August 2019, she met with a pain specialist who diagnosed her with phantom left arm pain and associated complex regional pain syndrome. *Id.* at 93-94. The pain specialist prescribed her oxycodone

and Lyrica.² *Id.* at 94. She had been taking the oxycodone and Lyrica until she was arrested on January 8, 2020. When she was arrested the MCCJC staff did not allow her to continue taking oxycodone or Lyrica because they were controlled substances. Dkt. 50-3 at 52. When Eads was booked at the jail, she informed officers she did not feel well and had a fever. Dkt. 55-12 at 111. She was placed in a detox cell until she could see Nurse Bell.³ Dkt. 55-12 at 111.

Taylor McAllister was a physician assistant and the contracted Medical Health Authority for the MCCJC. Dkt. 50-3 at 10. As the Medical Authority, McAllister was responsible for approving and supervising all medical procedures within the MCCJC. *Id.* at 11. McAllister rendered medical care to inmates and attended sick call at least twice per week. *Id.* at 12. McAllister practiced under the supervision of Dr. Basil Anderson.⁴ *See* Dkt. 51-3 at 8. Dr. Anderson met with McAllister regularly, was available by phone for questions, and regularly reviewed patient charts with McAllister. *Id.* at 4.

---

² It appears from the medical records that Eads had been on oxycodone for pain management prior to meeting with the pain specialist. The pain specialist's prescription was for Eads to take 15mg of oxycodone 3 times per day as needed and 100mg of Lyrica 3 times per day. Dkt. 50-3 at 92.

³ Debbie Bell is a Licensed Practical Nurse employed by the MCCJC. Dkt. 55-11. Bell was responsible for assisting McAllister, distributing medications, taking vital signs, and arranging for inmates to be seen by McAllister. *Id.*

⁴ Dr. Anderson never visited the jail and had not discussed Eads' case with McAllister prior to her death. Dkt. 51-3 at 5.

**MEMORANDUM DECISION AND ORDER - 3**

Jail staff asked McAllister to evaluate Eads on the morning of January 9, 2020. Dkt. 50-3 at 19. During that encounter Eads informed McAllister that she had a partial amputation of her left hand and told him about the pain management regime she had been on. *Id*. at 20, 72. McAllister evaluated her hand and noted no signs of infection. *Id.* at 25. McAllister took her vitals and noted that she had been taking oxycodone but denied other drug use. *Id.* at 21, 72. McAllister also noted that Eads was tired and that her heart rate was tachycardic but that it had a regular rhythm with no murmurs. *Id.* at 21-24, 72. McAllister diagnosed her with fatigue and probable drug withdrawal. *Id.* at 72. Under the section caption, "Plan," McAllister wrote: "No real complaints. Just tired. Could be the beginning of opioid withdrawal having been on 50 to 60 milligrams PO daily of oxy. Caught with meth last night. Will monitor closely." *Id.* at 24, 72. During this examination McAllister did not see any needle tracks on Eads' arms.[5] *Id.* at 21-22.

On January 13, 2020, Nurse Bell texted McAllister that "[Eads] thinks she's dying. Vitals look good pulse a little high. She's having officers help her get up to the bathroom because she 'hurts to bad' also [complains] of nausea this am." Dkt. 50-3 at 75. McAllister responded, "that sounds about right." *Id.* McAllister later

---

[5] The observations recorded on the booking report listed "N" for "does the prisoner have needle marks?" Dkt. 50-3 at 67. On the medical questionnaire Eads completed during booking she marked "Y" under "Do you use needles?" Dkt. 55-12 at 109. Eads' probation officer stated that Eads admitted using syringes to inject her prescription oxycodone. Dkt. 55-12.

explained in his deposition that Eads' statement did not surprise him based on her history and his examination of her. *Id.* at 40-41 He explained this was because

> [p]eople feel really crummy and it's unfortunate when they are withdrawing from drugs, and that is something that is very common ... And so in this situation, it did not grab my attention and it did not surprise me, and I would trust that if Nurse Bell would have seen something that was really concerning, she would have followed up with me further with that information.

*Id.* at 41.

At some point after January 9, 2020, Eads was prescribed 100 mg of Gabapentin twice per day for pain management.[6] *See* Dkt. 50-3 at 52. On January 21, 2020, Eads had a preliminary hearing on her probation violation. Dkt. 108-8 at 4. The Judge continued the hearing due to Eads' physical condition. *Id.* On the way back to the MCCJC, Eads complained to the officer transporting her of pain in her side and asked to go to the hospital. Dkt. 55-12 at 117. When Eads returned to the jail she met with Nurse Bell and told her of the pain in her side. *Id.* Nurse Bell texted McAllister that Eads was complaining that "her entire left side is on fire" and that "[s]he went to court and tried to get them to take her to the hospital." Dkt. 50-3 at 78. McAllister directed Nurse Bell to increase Eads' prescription of

---

[6] Plaintiff's exhibits indicate that Eads was prescribed Gabapentin on January 16, 2020. Dkt. 106-2 at 1. Nurse Bell does not remember the exact date, but exchanged a text with McAllister on January 13, 2020. Nurse Bell's chart notes indicate she saw Eads on January 13 and 15, but not on January 16. Dkt. 50-3 at 101.

Gabapentin to 300mg.[7] *Id.* at 32, 57, 78.

On January 21, Eads also met with a mental health counselor. Dkt. 106-4 at 1. The mental health counselor wrote that Eads had a bad fever and acid reflux and was breathing heavily lying in her bed. The mental health counselor indicated that Eads was exhibiting symptoms of anxiety and depression and that Eads did not feel good. *Id.* McAllister reviewed this record on January 23, 2020 and wrote that Eads was on the "PA schedule today 1/23/20."

McAllister's last encounter with Eads was on January 23, 2020. Prior to that encounter, Eads had asked to be moved from a detox cell to the general population. *Id.* at 28. Nurse Bell scheduled Eads to be seen by McAllister before approving her transfer to general population. *Id*. at 28, 55. When Eads met with McAllister, she walked into the exam room eating an apple from her left hand. *Id.* at 36. McAllister recorded the following in Eads' chart notes:

> Has no energy. She states she doesn't care anymore. Wants to get out and go sleep with her and be with the comfort of her mother. Left hand was hurting. Phantom pains. We increased gabapentin to 300 milligrams PO, BID, about three days ago. Has been doing better with the phantom pains. She states a 75 percent improvement. Met with Emily [the mental health counselor] on Tuesday. Found that helpful. Has been here over two weeks. Was taking 60 milligrams of Oxy per day before coming in. Wants to stay off them. Was on them for a year.

---

[7] In his deposition, McAllister testified that, while he did not take requests to go to the hospital lightly, it was not unusual for an inmate to ask to go to the hospital. Dkt. 50-3 at 30-31. Nurse Bell confirmed that it was common for detainees withdrawing from drugs to say they were dying or exaggerate their symptoms in an attempt to get pain medications. *Id.* at 56.

**MEMORANDUM DECISION AND ORDER - 6**

> Was on them for one year. States she has been very tired and low energy.

*Id.* at 32, 73. McAllister noted that Eads reported no chest pains, but that she did have shortness of breath, and diarrhea. *Id.* at 33, 73. Eads' blood pressure was 115/80, her pulse was 130, oxygen saturation was 92, and temperature was 100.1. *Id.* at 33, 73. McAllister also noted that she had a slightly tender abdominal exam, and that her talking seemed labored, but that may be exaggerated. *Id.* at 34, 73.

McAllister explained that he wrote "may be exaggerated" because the physical findings of his examination of Eads did not explain why she would have labored breathing. *Id.* at 34. Following the examination, McAllister's assessment was that Eads was still showing symptoms of opioid withdrawal and opioid-induced hypersensitivity syndrome. *Id.* at 35, 73. But, McAllister did not find anything in the physical examination or Eads' vitals concerning. *Id.* at 34. McAllister prescribed loperamide for diarrhea, clonidine for anxiety and withdrawal symptoms and had Eads continue taking the Gabapentin and Tylenol. *Id.* He also indicated that Eads would feel poorly for a few more days. *Id.*

In his deposition, McAllister testified that some individuals may exhibit opioid withdrawal symptoms 14 days after no longer taking opioids. *Id.* at 37. McAllister further testified:

> So like we discussed previously, there is two phases of opioid withdrawal. The first phase is associated with the symptoms we discussed, the runny nose, watery eyes, stomach upset, diarrhea,

**MEMORANDUM DECISION AND ORDER - 7**

fatigue, general malaise. Those can last for a couple of days.

The second phase -- the first phase can be rather unpleasant. The second phase can start around two weeks and last up to a month, and that's where you get increased anxiety. You can continue with fatigue. Most commonly at that point, you start to get diarrhea, you start to get abdominal pain, and you start to get a rapid heart rate.

*Id.* McAllister stated that he treated patients for opioid withdrawal "weekly, if not daily" at his primary practice and had treated a significant number of patients with similar symptoms to Eads. *Id.* at 45.

The evening of January 24, 2020, jail staff observed that Eads was unresponsive and called paramedics. *See* Dkt. 50-3 at 124. Eads was transported to the hospital where she was pronounced dead. *Id.* at 124, 127. The EMS report notes that Eads had an amputation to her left hand that was "old and healed." *Id.* at 124.

The Autopsy Report listed the coroner's findings as:

**FINDINGS:**
I. *Staphylococcus aureus* sepsis and endocarditis:.
   a. Bacterial endocarditis.
   b. Bilateral pneumonia with septic pulmonary emboli.
   c. *Staphylococcus aureus* and *Escherichia coli* cultured from the blood and lung tissue (see MICROBIOLOGY).
   d. History of chronic intravenous drug use.

*Id.* at 129. The coroner determined the cause of death was *staphylococcus aureus* sepsis and endocarditis. *Id.*

Following Eads death McAllister texted Nurse Bell and asked for photos of Eads' chart notes. Dkt. 50-3 at 79. He also texted Bell "I'm wondering if I

overlooked something." *Id* at 82. The following day McAllister had the following text exchange with Bell:

> McAllister: Do you know if she was eating?
>
> Bell: According to the officers yes. And she was eating an apple Thursday when we seen her.
>
> McAllister: Oh ya that's right… and you never heard of her puking?
>
> Bell: Nope. I only heard about diarrhea Thursday.
>
> McAllister: So..weird. I'm just bewildered by what happened. I feel like she didn't say anything about how she was feeling. At least I never heard of it. Just about her arm. If you hear of anything let me know.

*Id.* at 82-85.

During his deposition, McAllister testified that he made the appropriate decision for Eads based on his professional medical knowledge. Dkt. 50-3 at 42. He also testified that, after her death, he discussed Eads' case and chart with Dr. Anderson who agreed that McAllister's care of Eads was appropriate. *Id.* Finally, McAllister testified that, at the time, he was confident Eads was not suffering from sepsis, but if he thought she might be he would have ordered additional tests. *Id.* at 45.

While Eads was detained at the MCCJC she acted lethargic, moaned, complained of chronic pain and asked deputies to assist her with hygiene. Dkt. 55-11 at 3. McAllister was not aware of Eads behavior beyond the text messages Bell sent to him, his review of the mental health examination, and the examinations he

**MEMORANDUM DECISION AND ORDER - 9**

performed on Eads. Dkt. 50-3 at 39, 40. While she was incarcerated, Eads never submitted a "kite" or other request for medical care beyond asking to go to the hospital after her court appearance. Dkt. 55-11 at 5.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v.*

*Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in their favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

# ANALYSIS

## A. The Fourteenth Amendment Governs Plaintiff's Deliberate Indifference Claim

The parties briefed Plaintiff's claim under a subjective deliberate indifference standard. Until 2018, the Ninth Circuit held that a Plaintiff's deliberate indifference claim brought under either the Eighth or Fourteenth Amendment was analyzed under the same subjective standard. *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018); *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 668 (9th Cir. 2021). In *Gordon*, the Ninth Circuit held that a pretrial detainee's claim of deliberate indifference to medical needs arises under the Due Process Clause of the Fourteenth Amendment and is analyzed under an "objective" deliberate indifference standard.

In *Sandoval*, the Ninth Circuit found that the decedent was a pretrial detainee and applied the Fourteenth Amendment deliberate indifference standard. 985 F.3d at 662. There, the decedent was a probationer who was arrested on a probation violation and a new drug charge. In *Hanson v. Blaine County*, this Court recently considered the issue and held that a parolee who was being detained pending a revocation hearing was a pre-hearing detainee and the Fourteenth Amendment applied to his deliberate indifference claim. *Hanson v. Blaine Cty.*, 2021 WL 1601391 (D. Idaho Apr. 23, 2021).

Eads was detained at the MCCJC pending both a probation violation hearing

and trial on a new charge for possession of a controlled substance. *See* Dkt. 50-3 at 66. At the time of her death, she had not been found to have violated her probation nor convicted on the possession charge.[8] Accordingly, the Court finds that Eads was a pretrial detainee, and her claim of deliberate indifference arises under the Fourteenth Amendment.

### B. Deliberate Indifference by McAllister

Under the deliberate indifference standard adopted by *Gordon* and *Sandoval*, the Plaintiff must show that: 1) McAllister made an intentional decision regarding the denial of needed medical care; 2) The denial of needed medical care put Eads at a substantial risk of suffering serious harm; 3) McAllister did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable official under the circumstances would have understood the high degree of risk involved – making the consequences of McAllister's conduct obvious; and 4) By not taking such measures McAllister caused Eads' injuries. *Sandoval*, 985 F.3d at 669; 9th Cir. Model Civil Jury Instruction 9.30 (2020).

To satisfy the third element, the plaintiff must show that the defendant's actions were "objectively unreasonable," which requires a showing of "more than

---

[8] Eads had a preliminary hearing on January 21, 2020 for the probation violation, but that hearing was continued due to Eads' physical condition. She had a preliminary hearing for the possession charge on January 22, 2020, but did not enter a plea. Dkt. 108-8.

**MEMORANDUM DECISION AND ORDER - 13**

negligence but less than subjective intent—something akin to reckless disregard." *Sandoval*, 985 F.3d at 669 (quoting *Gordon* 888 F.3d at 1125). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon,* 888 F.3d at 1125 (citations and quotations omitted).

The facts of *Sandoval* are particularly instructive here. In *Sandoval*, unbeknownst to the arresting officers, the decedent consumed a large amount of methamphetamine. After being brought into the jail, a guard told one nurse that the decedent was "sweating, tired, and disoriented" and that the nurse needed to evaluate the decedent more thoroughly. 985 F.3d at 670. Despite this information, the nurse did nothing more than administer a duplicative blood sugar test and did not conduct any further evaluation. The nurse then failed to check on the decedent at any point in his remaining six-hour shift, even though he suspected the decedent was under the influence of drugs or alcohol. *Id.* The Ninth Circuit held that a jury could find that the nurse's actions would be akin to reckless disregard.

Here, McAllister evaluated Eads one day before her death. The appointment was scheduled because Eads had asked to move to the jail's general population. Eads had never asked to see medical staff beyond asking to be taken to the hospital for pain. McAllister was unaware of Eads behavior beyond the text messages from Bell, reviewing the mental health evaluation, and his own examinations of her.

**MEMORANDUM DECISION AND ORDER - 14**

Eads walked into the examination room under her own power and was eating an apple with her amputated hand. Eads admitted to her probation officer that she was injecting oxycodone, and listed needle use on her jail medical survey. However, McAllister had not observed any needle marks on Eads arms at his initial examination of her, nor did the jail booking deputy note any needle marks on her arms.

Despite Eads having been incarcerated for two weeks, McAllister found that she was still exhibiting opioid withdrawal symptoms and noted she had been taking 60 milligrams of oxycodone per day for the past year. He noted that she had no energy, but that her pain had improved 75 percent since the Gabapentin dose was increased. Eads also told him that she had diarrhea. Her pulse was 130 beats per minute, her oxygen saturation was 92 percent, and her temperature was 100.1.[9] McAllister also noted that Eads had a slightly tender abdomen. McAllister prescribed Eads loperamide for diarrhea, clonidine for anxiety and withdrawal symptoms, and had Eads continue taking the Gabapentin and Tylenol.

Eads told McAllister that her breathing was labored. McAllister noted she may be exaggerating because that symptom did not line up with his examination of

---

[9] At the initial examination on January 9, 2020, Eads' pulse was 122 beats per minute, her oxygen saturation was 98 percent and her temperature was 98.4. Dkt. 50-3 at 72.

**MEMORANDUM DECISION AND ORDER - 15**

her. It does not appear that McAllister listened to Eads' heart or lungs through a stethoscope, but he did observe her climb up on the table and take a few deep breaths. Dkt. 50-3 at 35.

McAllister testified that he regularly treated patients with opioid withdrawal symptoms similar to Eads and that some patients would still have withdrawal symptoms after two weeks of sobriety.

The only evidence the Plaintiff has introduced that McAllister's treatment may have been unreasonable is an expert report from Dr. Gulick.[10] Dkt. 69-1. Dr. Gulick is a medical officer at Snake River Correctional Institution and the Chief Medical Officer at two other correctional institutions. He has practiced medicine since 1992. *Id.* at 13. Most of Dr. Gulick's report contains hyperbole and improper legal conclusions. However, there are a few passages in the report that call into question McAllister's treatment of Eads. Dr. Gulick states:

> [Eads'] pulse of 130 and abdominal pain alone warranted an emergency room trip with possible differential diagnoses serious and extensive. [McAllister] also misses the drop in her saturation from 98% to a very not normal 92%. … Normal non-COPD type patients don't have 92% saturations and now she has a fever.
>
> …

---

[10] Plaintiff's counsel initially filed Dr. Gulick's report without a supporting affidavit. On April 22, 2021, counsel filed an affidavit of Dr. Gulick making the report admissible. Dkt. 96. Plaintiff also filed a report of Judy Williams, RN, the report provides a timeline of events and many legal conclusions, but does not address McAllister's care of Eads. Dkt. 73-1.

> Despite [Eads] having a fever, worsened tachycardia, worsened oxygen saturations, and new abdominal pains [McAllister] failed to consider the many serious life-threatening diagnoses that were very possible if not probable. Respiratory rate wasn't taken and per all others accounts she was having breathing difficulties and moaning.
>
> …
>
> Not only was his diagnosis not possibly valid but the patient has also clearly told him new problems had started 3 days prior. Despite new symptoms and diarrhea, she was given no chest or cardiac exam and a minimal abdominal exam, partial vital signs are taken, and no thought given to serial checks. If they had checked those same vitals just by repeating them sitting up or again hours later the changes could have been definitive for a diagnosis and likely alarming.
>
> …
>
> If [McAllister] had performed simple orthostatic blood pressure and pulse comparisons, simply ordered basic laboratory testing, or noted her abnormal findings any competent health provider would have sent her to the ER, and she would be alive today.

*Id.* at 10-11.

It is not disputed that McAllister made an intentional decision with regard to the care provided to Eads. He examined her on January 23, 2020, diagnosed her with opioid withdrawal, and prescribed her various medications for diarrhea, anxiety, and pain. Gulick opines that, if McAllister had appropriately diagnosed Eads her death could have been prevented, which at least presents an issue of fact

going to causation.[11] The real issue is whether McAllister's conduct was "objectively unreasonable."

To be objectively unreasonable, McAllister's conduct must be judged from the position of a medical provider in the same circumstances and his conduct must be akin to reckless disregard. *See Sandoval*, 985 F.3d at 670.

Dr. Gulick's report relies both on what McAllister knew and what he didn't know – Eads' behavior while incarcerated and her intravenous drug use. However, he cannot be held responsible for failing to draw appropriate conclusions from facts of which he was not aware.

McAllister saw Eads after she had asked to be moved to the general population. She had not come in specifically for her new symptoms. She walked into the exam room under her own power and was eating. She also reported that the Gabapentin had improved her pain symptoms. McAllister's treatment of Eads had primarily related to pain management and heroin withdrawal. McAllister did

---

[11] It is not clear from the record how Eads contracted the infection that ultimately caused her death. Initially, Plaintiff's theory was that her amputated hand had become infected, and the infection moved to her heart. But, there is absolutely no evidence in the record to support this theory and Dr. Gulick does not address it in his report. There was some discussion in the briefing that she contracted the infection from intravenous drug use. The Court is not aware of any evidence in the record that conclusively shows where the infection originated. Even if the infection was from intravenous drug use, it does not appear that McAllister noticed any needle marks on Eads' when he first examined her nor did the booking officer. Had McAllister been aware of needle marks, or intravenous drug use, this might have provided more reason for him to look deeper into Eads' symptoms. The Court can find nothing in the record indicating that McAllister was aware of Eads' intravenous drug use.

**MEMORANDUM DECISION AND ORDER - 18**

not know that Eads had been injecting her oxycodone.

Dr. Gulick suggests that McAllister's diagnosis could not possibly have been valid, but gives no explanation or reasoning for that conclusion. Beyond this single passage, Dr. Gulick's report does not state that Eads symptoms could not have been due to opioid withdrawal. Instead, he suggests that McAllister failed to realize the significance of certain symptoms, and failed to consider potentially more severe diagnoses. He then points out things McAllister could have done to diagnose Eads had he recognized the importance the symptoms.

Even construing the evidence in a light most favorable to the Plaintiff, she has not created a material issue of fact as to McAllister's medical decisions relating to Eads. Dr. Gulick's report does call into question McAllister's medical judgment and strongly suggests he was negligent. Were this a medical malpractice claim, that would be sufficient to deny summary judgment. But this is a claim of deliberate indifference under the 14th Amendment, and the record cannot support a finding that McAllister recklessly disregarded Eads' medical condition.

### C. Conclusion

Accordingly, the Court finds that there are no material issues of fact as to whether McAllister was deliberately indifferent to Eads' serious medical needs. Accordngly, McAllister is entitled to summary judgment.

# ORDER

**IT IS ORDERED** that Defendant, Taylor McAllister's Motion for Summary Judgment (Dkt. 50) is GRANTED.

DATED: July 12, 2021

_____
B. Lynn Winmill
U.S. District Court Judge